# Illinois Official Reports

## Appellate Court

---

### *People v. Bochenek*, 2020 IL App (2d) 170545

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DOMINIK K. BOCHENEK, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-17-0545 |
| Filed | February 19, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 16-CF-497; the Hon. John J. Kinsella, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, Yasemin Eken, and Bryan G. Lesser, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman, Assistant State's Attorney, of counsel, and Richard Green, law student), for the People. |
| Panel | PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Burke and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a six-person jury trial in the circuit court of Du Page County, defendant, Dominik K. Bochenek, was convicted of a single count of identity theft not exceeding $300 (720 ILCS 5/16-30(a)(1) (West 2014)) for the unauthorized use of Anthony Fatigato's credit card to buy cigarettes at a gas station in Palatine, Illinois. Defendant was sentenced to a 30-day term of periodic imprisonment and a 30-month term of probation. On appeal, defendant challenges as unconstitutional the venue provision pertaining to identity theft (*id.* § 1-6(t)), allowing proper venue in the county in which the victim resides. Defendant also argues that the record does not show that he knowingly waived his right to a 12-person jury trial and that the trial court abused its discretion in allowing the State to present excessive and unduly prejudicial other-crimes evidence. We affirm.

¶ 2                                            I. BACKGROUND

¶ 3        We summarize the facts elicited at trial and appearing in the record on appeal. On April 26, 2016, defendant was indicted with one count of identity theft and one count of unauthorized use of an unissued credit card (*id.* § 17-36(ii)) stemming from defendant's June 17 to 18, 2015, late night and early morning use of Fatigato's Chase Bank and U.S. Bank credit cards to buy cigarettes at gas stations in Itasca and Palatine, Illinois. Defendant never challenged that it was he who used Fatigato's credit cards; rather, defendant always maintained that he believed that he was authorized to use the cards because he was given them by his girlfriend, Alexi Kern, and therefore he lacked the requisite intent.

¶ 4        Before trial, the State moved *in limine* to admit other-crimes evidence for the purpose of proving defendant's intent, plan, identity, and absence of mistake. Specifically, the State sought to introduce evidence of two other incidents of defendant's unauthorized purchase of cigarettes at gas stations, one on May 17, 2015, and the other on the day before the instant offense, on June 17, 2015. The State sought to introduce evidence that, on each date, defendant used credit cards that belonged to others and were taken from the owners' vehicles the night or early morning of the incident shortly before the purchases. In addition, the evidence would show that defendant used the same black vehicle, wore the same black hoodie, and was accompanied by Kern on each of the other nights. The trial court balanced the relevance and the prejudicial effect of the proposed evidence, noting that any evidence offered by the State had some prejudicial effect to the defense but also realizing that the proper question was whether the evidence was unduly prejudicial. The trial court observed that, across the charged offense and the other-crimes incidents, the same vehicle was used, the events happened within a brief period, defendant was accompanied by Kern, and defendant purchased cigarettes with credit cards not in his name. The trial court allowed the motion to admit the evidence for the purposes of plan, identity, lack of mistake, motive, and *modus operandi*.

¶ 5        Later, defendant filed a motion to dismiss the charges on the ground that venue was improper in Du Page County. The motion was heard the day the trial was scheduled to begin. Defendant argued that the offense occurred in Lake County, so the venue provision pertaining to identity theft was unconstitutional because it conflicted with the Illinois Constitution's guarantee that a defendant would be tried in the county in which the offense was committed. The trial court denied defendant's motion to dismiss, reasoning that the identity-theft statute, in describing the locales where the crime was committed, included the residence of the victim.

¶ 6    Immediately before the hearing on defendant's motion to dismiss, defendant's counsel informed the trial court that defendant preferred a six-person jury. Defense counsel stated that he "already spoke to [his] client" about the six-person jury. Following the decision on defendant's motion to dismiss, the trial court revisited the composition-of-the-jury issue, asking defendant's counsel if he had discussed the decision to proceed with a six-person jury with defendant. Counsel replied that he had. The court then asked defendant if it was his choice to utilize a six-person jury, and defendant affirmed that it was. When the potential jurors arrived, the trial court stated:

"this will be a selection of a jury of six. I know most of you are probably accustomed to twelve. If you've seen Twelve Angry Men, you know it's twelve. It used to be men, too; that's another thing we changed. But in this instance it will be a jury of six and we will select one alternate."

¶ 7    The matter proceeded to trial. Fatigato testified that he lived in Itasca, Du Page County, Illinois. On June 17, 2015, he parked his car in his driveway, accidentally leaving his wallet in the car. Fatigato explained that he had begun taking his wallet out of his pocket when he drove because it was uncomfortable to sit on, so he would place it on the front seat and take it with him once he exited the car. On June 17, he left the wallet on the front seat. When he woke up the next morning he realized his wallet was not in the house. Fatigato checked his car and discovered that his wallet, with a Chase Bank credit card and a U.S. Bank debit card, was missing.

¶ 8    Fatigato called the credit card companies to cancel the missing cards. He learned that, during the early morning hours of June 18, 2015, the cards had been used at gas stations. Fatigato's U.S. Bank card (the basis for the charge of using an unissued card) had been used at a gas station in Itasca, and his Chase Bank card (the basis for the identity theft charge) had been used at a gas station in Palatine (located in Lake County, Illinois). Fatigato testified that, on June 18, 2015, he had not made any purchases at either gas station. Fatigato testified that he had not authorized anyone to use his credit cards. Fatigato examined a copy of the receipt of the transaction at the Palatine gas station. The receipt bore what purported to be Fatigato's signature. Fatigato testified that he had not written the signature. Ultimately, Fatigato successfully got the June 18 charges on each card reversed.

¶ 9    Abid Hussein testified that he was the manager of the Palatine gas station. Hussein testified that he maintained a video surveillance system and was trained in its use. Hussein testified that, on June 17 to 18, 2015, the system was properly functioning.

¶ 10    Detective Tiffany Wayda, a detective with the Du Page County Sheriff's Office, testified that she investigated the theft of Fatigato's credit cards. Wayda testified that she reviewed the recording of the video surveillance systems of both the Palatine and the Itasca gas stations. Wayda testified that, the Itasca recording showed a black car arriving at the gas station, and the driver went inside and made a purchase. Wayda could not identify the driver of the black car from the footage she reviewed.

¶ 11    Wayda testified that, the Palatine recording showed a black Toyota car arriving at the gas station, and a white male from the car entered the gas station and purchased cigarettes. The man signed the credit card receipt and left the gas station in the black car. Wayda could discern the license plate number and discovered that the car was registered to Barbara Bochenek, defendant's mother. Wayda testified that, when she compared photos of defendant to the video

- 3 -

from the Palatine gas station, she concluded that the man seen on the footage was defendant, whom she identified in open court.

¶ 12    The State then presented its other-crimes evidence. The trial court instructed the jury that the other-crimes evidence could be used for the limited purposes of identification, intent, plan, and absence of mistake. Ivette Garza testified that, on May 17, 2015, her Discover credit card was used at the same gas station where Fatigato's U.S. Bank credit card had been used. Sometime during the night of her wedding, May 17 or 18, 2015, the card was taken from her mother's car outside the wedding venue. The card was used on May 17 between 11 p.m. and midnight. Garza testified that she did not make the purchases and did not authorize or permit anyone to make the purchases. Garza did not know defendant.

¶ 13    Andrew Wagner, the manager of the Itasca gas station, testified that he was responsible for the video surveillance equipment at that location. Wagner testified that, the recording made on May 17, 2015, showed that, at 11:14 p.m., defendant purchased two cartons of cigarettes. In the recording, defendant is wearing a gray hoodie. Defendant purchased the cigarettes using Garza's Discover card. Wagner gave the police a copy of the recording.

¶ 14    Detective Chris Banaszynski of the Wood Dale Police Department testified that, as part of his investigation of the theft and use of Garza's Discover card, he viewed the copy of the surveillance footage from the Itasca gas station. He reached out to other departments and received a photograph of a person wearing a 2013 Rolling Meadows High School graduation T-shirt. Banaszynski testified that he reviewed the school's yearbook from 2013 and ultimately identified defendant as the person who used Garza's card in the gas station. He also identified defendant in open court. Banaszynski testified that, when he went to defendant's residence, he observed a black Toyota that was registered to defendant's mother and that matched the vehicle in the surveillance footage.

¶ 15    The State moved on to the June 17, 2015, other-crimes evidence. In the midst of that testimony, the trial court interrupted and again instructed the jurors that the other-crimes evidence could be used for the limited purposes of identification, intent, plan, and absence of mistake. Brian Egofske, an Itasca resident, testified that he lived across the street from Michele Merola. Egofske testified that he had equipped his home with a home surveillance system. At their request, he gave the police surveillance footage from June 18, 2015, between midnight and 3 a.m. Egofske watched the footage and observed two people trying the doors to his car in an apparent effort to get inside. When the car proved to be locked, the people crossed the street to Merola's residence.

¶ 16    Merola testified that he lived across the street from Egofske. Merola testified that, on June 17, 2015, because he was working on his house, he parked his pickup truck in the street across from Egofske's home. It became late, and Merola neglected to pull his truck into his driveway. Inside the truck he had left, among other things, his wallet, which contained cash and a Chase Bank credit card. The next morning, Merola discovered that the wallet containing the card was missing from his truck. Merola promptly called the credit card company to cancel the stolen card. During that call, he learned that the card had been used at about 1 a.m. at the Itasca gas station where Fatigato's and Garza's cards had been used. Merola testified that he had not been at that gas station and had not authorized anyone to use the card. Merola was shown the receipt from the 1 a.m. transaction, and he testified that he did not make the signature on the receipt.

¶ 17    Sergeant Tim Mace of the Itasca Police Department testified that, on June 17, 2015, he had been assigned to investigate the theft from Merola's truck and the ensuing use of Merola's

credit card. Mace testified that he received from Egofske a copy of Egofske's surveillance footage. In the footage, Mace saw two people approach Egofske's car; one was a male, and the other was a white female wearing a black top and a distinctive striped skirt. Mace testified that the woman was also observed in the Itasca gas station's surveillance footage when Merola's credit card was used. Mace determined that the male was defendant and the female was Kern. The surveillance video showed that, after defendant and Kern were unsuccessful in entering Egofske's car, the two crossed the street to Merola's truck. Mace testified that, according to the time stamp on Egofske's footage, defendant and Kern were at the vehicles at about 2:28 a.m. According to the time stamp on the footage from the Itasca gas station, defendant and Kern were at the gas station a short time later, at 2:36 a.m.

¶ 18    Wagner testified that he provided the police with the video surveillance footage of defendant and Kern's purchase on the night of June 17-18. Wagner testified that defendant used a credit card to purchase cigarettes.

¶ 19    Defendant testified on his own behalf. Defendant noted that English was not his first language. In May and June 2015, defendant had been in a dating relationship with Kern, for whom he had "strong feelings" and in whom he placed his trust. Defendant testified that Kern had "rich family members," so when she gave him credit cards to use, he believed her when she said that the cards were from her family. Defendant denied noticing the name on any of the credit cards he received from Kern; he just trusted Kern. Defendant denied breaking into or taking things from cars; likewise, he never witnessed Kern doing so.

¶ 20    On cross-examination, defendant explained that, when Kern gave him a credit card to use, he would reimburse her in cash because they were sharing expenses. Regarding the Fatigato offense, defendant testified on cross-examination that Kern was with him at the gas stations in Itasca and Palatine but she did not get out of his car. Defendant admitted that he had his own credit cards, but he used the cards Kern had given to him.

¶ 21    During closing arguments, the State summarized the evidence concerning the use of Fatigato's cards as well as all of the other-crimes evidence. The State reminded the jury that it was to consider the other-crimes evidence only for the purposes of showing defendant's motive, intent, identity, and absence of mistake. The trial court also reiterated the limiting instruction concerning the other-crimes evidence during its reading of the jury instructions. During the rebuttal closing argument, however, the State argued: "Conveniently, though, all three victims—in this case by the way, this is about Mr. Fatigato. You are deliberating on Mr. Fatigato's card whether he used Mr. Fatigato's card at the [Palatine and Itasca gas stations]." The State also argued: "Four transactions at gas stations. All three car burglaries. All him."

¶ 22    During the course of the deliberations, the jury asked a question concerning the meaning of "issued" regarding the unissued credit card charge (count II). The trial court revisited defendant's motion for a directed verdict and directed a verdict in favor of defendant on that count. The jury returned a guilty verdict on the identity theft charge.

¶ 23    Defendant's motion for a new trial was denied. Thereafter, defendant was sentenced to a 30-day term of periodic imprisonment and a 30-month term of probation. Defendant timely appeals.

¶ 24                                II. ANALYSIS

¶ 25        On appeal, defendant argues that the special venue provision for identity theft conflicts
with the constitutional guarantee that an offense will be prosecuted in the county in which it
occurred and, thus, is facially unconstitutional. Defendant also contends that the record does
not show that he knowingly waived his right to a 12-person jury and that the trial court abused
its discretion in allowing too much unduly prejudicial other-crimes evidence. We consider
defendant's contentions in turn.

¶ 26                                  A. Venue

¶ 27        Defendant argues that the venue provision for identity theft (720 ILCS 5/1-6(t) (West
2014)) is facially unconstitutional because the Illinois Constitution gives a defendant the right
"[i]n criminal prosecutions *** to have a speedy public trial by an impartial jury of the county
in which the offense is alleged to have been committed." Ill. Const. 1970, art. I, § 8. Defendant
contends that the offense of identity theft occurred in Lake County and the trial for the offense
was conducted in Du Page County pursuant to section 1-6(t). He asserts that the trial occurred
in a different county than that in which the offense occurred and therefore his constitutional
rights were infringed and his conviction must be reversed.

¶ 28        Defendant contends that section 1-6(t) is facially unconstitutional. We review *de novo* the
issue of whether a statute is unconstitutional. *Kakos v. Butler*, 2016 IL 120377, ¶ 9. We
presume that a challenged statute is constitutional, and we will construe the statute in a manner
that upholds its constitutionality if it is reasonably possible to do so. *Id.* The party challenging
the statute has the burden of demonstrating that the provision is unconstitutional. *Id.* When
launching a facial challenge to the constitutionality of a statute, the challenging party must
establish that there is no set of circumstances under which the statute would be valid. *Id.*

¶ 29        Section 16-30(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/16-30(a)(1) West
2014)) provides that "[a] person commits identity theft when he or she knowingly: (1) uses any
personal identifying information or personal identification document of another person to
fraudulently obtain credit, money, goods, services, or other property." Defendant parses this
provision into two elements: using and obtaining. We believe the proper view of the elements
needed to prove identity theft under subsection (a)(1) are the (1) knowing (2) use (3) of any
personal identifying information or personal identification document of another person (4) to
fraudulently obtain (5) credit or money or goods or services or other property. *Id.* Regardless
of the parsing into elements, defendant argues that "[n]o element of the crime is connected to
the location of the victim's residence."

¶ 30        Defendant notes that the venue statute, in harmony with the Illinois Constitution, provides
that: "Criminal actions shall be tried in the county where the offense was committed, except as
otherwise provided by law." *Id.* § 1-6(a). The special venue provision for identity theft
provides: "A person who commits the offense of identity theft or aggravated identity theft may
be tried in any one of the following counties in which: (1) the offense occurred; (2) the
information used to commit the offense was illegally used; or (3) the victim resides." *Id.* § 1-
6(t). Defendant argues that, by allowing venue to be in the county in which the victim resides,
the special venue provision conflicts with the constitution's guarantee that a criminal defendant
will be tried in the county in which the crime occurred. Further, according to defendant, the
fact that the offense of identity theft does not include the victim's residence as an essential

element of the offense means that the special venue provision conflicts with the constitution. We disagree.

¶ 31    Quite simply, the venue statute (*id.* § 1-6) enacts the constitutional guarantee with the qualification that exceptions may be "provided by law." Subsection (t) provides an exception for cases of identity theft, fixing venue in three places: where "(1) the offense occurred; (2) the information used to commit the offense was illegally used; or (3) the victim resides." *Id.* § 1-6(t). In the first two instances, the special venue provision fixes venue where the offense occurred; the defendant either physically presented the identification information or document at the place he or she tried to use it (subpart (1)), or else used the identification information or document remotely, such as by telephone or computer (subpart (2)). In the third instance, the injury occurred at the residence of the victim. In each instance, the constitutional command that the defendant receive a jury trial in "the county in which the offense is alleged to have been committed" is fulfilled. Ill. Const. 1970, art. I, § 8. Obviously, for subparts (1) and (2) of the special venue provision, the physical acts are accomplished at a particular place and a jury trial in that particular place satisfies the constitutional command; for subpart (3), a jury trial in the county in which the victim resides satisfies the constitutional command as the victim's possessory interest in his or her personal identifying information or personal identifying document is where the victim resides. Thus, the special venue provision expressly enacts the constitutional requirement by defining where the offense occurs.

¶ 32    Defendant disputes our interpretation of subpart (3). In defendant's view, the rationale of the dissent in *State v. Mayze*, 622 S.E.2d 836 (Ga. 2005), provides the better-reasoned approach. In *Mayze*,[1] the victim mislaid his wallet in Fulton County, the defendant accessed the victim's credit history in De Kalb County, and defendant was charged in Clayton County, where the victim resided. *Id.* at 838. The defendant moved to dismiss the charges as unconstitutional based on the purported conflict between the Georgia venue statute and constitution (which are sufficiently similar to the Illinois venue statute and constitution as to provide guidance). *Id.* In that case, however, the trial court dismissed the charges and held the venue statute unconstitutional. *Id.*

¶ 33    The *Mayze* majority read the venue provision *in pari materia* with the identity fraud provision and concluded that, when so read, the crime of identity fraud occurred in the county in which the victim was located because the act was the unauthorized use of the victim's personal information. *Id.* at 839. This guidance would suggest that, in Illinois, reading section 16-30 in *in pari materia* with section 1-6(t), the same result should obtain because the prohibited act is the unauthorized use of the victim's personal information.

¶ 34    Defendant rejects the *Mayze* majority's reasoning in favor of the dissent's conclusion that venue is proper only in a county in which the elements of the offense physically occurred. *Id.* at 845 (Melton, J., dissenting). This overlooks the fact that identification information is intangible and resides with the victim. *Id.* at 839 (majority opinion). Nevertheless, defendant here argues that the *Mayze* dissent's position is preferable because "it connects the venue to the defendant's conduct in committing the offense." A defendant, however, is guaranteed a jury trial only in "the county in which the offense is alleged to have been committed," not

_____

[1]We note that no Illinois cases have specifically addressed the special venue provision for identity theft *vis-à-vis* the Illinois Constitution. We may consider foreign authority to provide persuasive authority to fill such a vacuum. *People v. Bensen*, 2017 IL App (2d) 150085, ¶ 30.

where "the defendant's conduct in committing the offense" occurred. The special venue provision is the legislative enactment of the constitutional guarantee and, due to the partially intangible nature of identity, provides three valid loci for the commission of an identity theft under section 16-30(a), and when read *in pari materia* the legislative intent to define the offense as occurring in any and all of the three loci is abundantly clear. Therefore, we conclude that the *Mayze* majority's reasoning is persuasive and provides significant guidance to interpreting the special venue provision at issue in this case.

¶ 35    Thus, section 1-6(t) does not conflict with the Illinois Constitution because it must be read *in pari materia* with section 16-30. When read together, the venue provision defines the prohibited act of using the victim's personal information as occurring where the physical act occurred (either in person or over or through a communication network) as well as where the victim resides. There is no conflict with the constitution because, by legislative definition enacting the constitutional command, the offense of identity theft occurs both where the physical acts occur as well as where the intangible identification information is located: in the victim's residence. Therefore, section 1-6(t) does not violate the venue guarantee of section 8 of article I of the Illinois Constitution and the trial court did not err in rejecting defendant's challenge to the provision's constitutionality.

¶ 36    We can also approach defendant's argument from a historical perspective. The Illinois Constitution of 1818 provided that the defendant had the right to a "speedy public trial by an impartial jury of the vicinage" (Ill. Const. 1818, art. VIII, § 9); likewise, the Illinois Constitution of 1848 provided that the defendant had the right to "a speedy public trial by an impartial jury of the county or district wherein the offence shall have been committed" (Ill. Const. 1848, art. XIII, § 9). By contrast, the Illinois Constitution of 1870 provided that the defendant had the right to a "speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." Ill. Const. 1870, art. II, § 9. The change is significant: in the constitutions of 1818 and 1848, the prosecution of an alleged offense was limited absolutely to the county in which it was actually committed. *Watt v. People*, 126 Ill. 9, 18 (1888). However, under the Constitution of 1870, the change in language relaxed the inflexible rule and allowed for prosecution in counties in which the offense was *alleged* to have been committed. *Id.* The *Watt* court reasoned that the Constitution of 1870 "may be regarded as empowering the General Assembly to provide, in its discretion, for the presentment of indictments in which the allegation as to the vicinage of the offense may not be in accordance with the actual fact." *Id.*

¶ 37    The Illinois Constitution of 1970 retained verbatim the language from the Constitution of 1870 and provided that the defendant had the right to "a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." Ill. Const. 1970, art. I, § 8. This means that the *Watt* court's interpretation of the provision from the Constitution of 1870 remains good law and a proper interpretation of the identical provision of the Constitution of 1970. Thus, where the legislature has provided for venue at variance with the "actual fact" (section 1-6(t)), the Illinois Constitution supports the legislative choice. See *Watt*, 126 Ill. at 18. (We note that *Watt* involved the commission of a murder on a train passing through several counties leading to uncertainty as to the county in which the murder was actually committed. *Id.* at 19. The court determined that the prosecution was proper in any of the counties through which the train passed. *Id.*)

¶ 38    Here, the legislature, much like with the then new technology of trains leading to uncertainty where a crime was actually committed, defined identity theft as occurring both where the physical act occurred and where the identity reposes, namely with the victim. This is expected and allowed and proper. See *id.* at 18. Accordingly, under this analysis too, defendant's contention is not well taken.

¶ 39    Even if section 1-6(t) conflicts with the Illinois Constitution as applied in this case, because defendant has raised a facial challenge to the provision, he must still demonstrate that there is no set of circumstances under which the challenged provision would be valid. *Kakos*, 2016 IL 120377, ¶ 9. If, for example, an Illinois citizen had his or her identity stolen by someone in another state, then under defendant's construction, the offender could not be prosecuted in Illinois because the physical acts associated with the identity theft all occurred out of state. Under this set of circumstances, Illinois's interest in protecting its citizens is fatally compromised. *E.g.*, *People v. Madrigal*, 241 Ill. 2d 463, 467 (2011) ("purpose of the identity theft statute is to protect the economy and people of Illinois from the ill-effects of identity theft"); *Bensen*, 2017 IL App (2d) 150085, ¶ 23 (criminalization of identity theft recognized the burden such conduct places on the Illinois economy). The special venue provision, expressly reposing the victim's identity information in the victim's place of residence, recognizes the interest in protecting the victimized even if it may be less convenient for the offender. We cannot say, then, that there is no set of circumstances under which section 1-6(t) would be valid.

¶ 40    Accordingly, we reject defendant's facial challenge to the constitutionality of section 1-6(t).

¶ 41                              B. Waiver of 12-Member Jury

¶ 42    Defendant next contends that there is no evidence in the record to show that he knowingly waived his right to a 12-person jury because the record is silent on whether defendant even knew that he could request one. The right to a jury trial in a criminal case is guaranteed under both the federal and state constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §§ 8, 13. Illinois has codified the right to a jury trial (725 ILCS 5/115-1 (West 2014)), and a jury consists of 12 members (*id.* § 115-4(b)). A defendant may entirely waive his or her right to a jury trial, which necessarily means that he or she may also waive his or her right to a jury composed of 12 members. *People v. Dereadt*, 2013 IL App (2d) 120323, ¶ 15. The question here is whether the record shows that defendant provided a knowing waiver of a 12-person jury.

¶ 43    As a preliminary matter, we note that defendant candidly admits that the 12-person-jury-waiver issue was not raised in a posttrial motion, and he asks us to consider the issue under the plain-error doctrine. The State, however, does not argue defendant's forfeiture at all and addresses only the merits of the issue. It is well settled that the State may itself waive a defendant's forfeiture of an issue. *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003). Accordingly, we hold this to be the case here, and we address the merits of defendant's contention regarding the waiver of a 12-person jury.[2]

_____

[2]We also note, in light of our discussion below, that the outcome is the same whether we address the issue under plain error or on the merits.

¶ 44    The morning before jury selection commenced, defendant's counsel, with defendant present in open court, stated: "we would be asking for a jury of six. I already spoke to my client about it." Defendant did not object or disagree. That afternoon, as jury selection was about to commence, the trial court asked counsel if he had discussed with defendant whether to proceed with a six-person jury. Counsel answered that he had. The trial court then asked defendant if it was also defendant's choice to proceed with a six-person jury. Defendant answered that it was. When the prospective jurors were before the trial court, the court informed them, in defendant's presence, that it would be conducting the trial before a 6-person jury instead of a 12-person jury. Defendant stood mute.

¶ 45    Under these circumstances, the record supports the inference that defendant was fully apprised of his rights regarding a jury trial and knowingly waived them. In the first instance, defendant's counsel stated that he had discussed the choice with defendant. We acknowledge that counsel did not specifically state that he had discussed the choice in terms of a 6- or 12-person jury but only that he had discussed the choice with defendant. The language employed by counsel, however, leads to the natural and reasonable inference that counsel explained the choice between a 6-person and 12-person jury in making the decision to seek a 6-person jury. Therefore, we conclude that the representation by counsel, as an officer of the court, must be given its natural and proper weight. We further note that the trial court repeated the inquiry and asked defendant specifically if it was his choice to agree to a six-person jury. Shortly thereafter, the trial court informed the prospective jurors that they would be involved in a 6-person jury rather than the customary 12-person jury. Based on the totality of the facts, we hold that defendant knowingly waived his right to a 12-person jury.

¶ 46    Defendant argues that *People v. Matthews*, 304 Ill. App. 3d 415 (1999), compels the opposite result. In that case, there were similar representations made by the defendant's counsel, that " 'we [would] be asking for a six[-]person jury.' " *Id.* at 416. The trial court also informed the prospective jurors that they would be participating in a 6-person jury rather than a more customary 12-person jury. The defendant's waiver was noted on the docket sheet, and the defendant raised the issue in his posttrial motion. *Id.* at 417.

¶ 47    The court reviewed a number of cases in which a jury trial with less than 12 members was held. In those cases, the court discerned an express waiver by the defendants. *Id.* at 417-19. The court then held that, "nothing in the record indicate[d] that [the] defendant was aware of his right to a 12-person jury. Nothing in the record indicate[d] that [the] defendant agreed to a jury of fewer than 12 members *** or acquiesced in a jury of six." *Id.* at 419.

¶ 48    In a strong dissent, however, Justice Welch pointed out that there were plenty of instances in the record from which a knowing waiver could be inferred. *Id.* at 420-21 (Welch, J., dissenting). Specifically, the dissent noted that defense counsel not only agreed to the six-person jury, but he did so in the defendant's presence; likewise, the trial court noted the six-person jury in the defendant's presence. *Id.* at 421. The dissent concluded that, because of the notifications in the defendant's presence, to which the defendant did not object, the record was not silent and, moreover, that the complete waiver of a jury can be had "where, in the accused's presence and without objection from the accused, defense counsel expressly advises the court of the accused's desire to proceed by bench trial," and believed that there was no reason why the principle should not apply to a waiver to the number of jurors hearing the trial. *Id.*

¶ 49    In *Dereadt*, this court distinguished *Matthews* because counsel stated that she had spoken with the defendant about whether he wanted a jury of 6 or 12. *Dereadt*, 2013 IL App (2d)

120323, ¶ 20. In fact, we held that this was dispositive and made the case stronger than one of simple acquiescence. *Id.* Likewise, in *People v. Harper*, 2017 IL App (4th) 150045, ¶¶ 32-33, the court upheld the defendant's waiver where his counsel requested a six-person jury in the defendant's presence and noted that she had discussed the matter with the defendant; additionally, the trial court ascertained that it was the defendant's choice before accepting the waiver. Both *Dereadt* and *Harper* appear to follow the reasoning of the dissent in *Matthews*.

¶ 50    We choose to follow *Dereadt*, *Harper*, and the *Matthews* dissent, finding the reasoning expressed in these cases to be compelling. We see no reason to treat defendant's acquiescence here any differently than a waiver of the entire jury. Accordingly, we reject defendant's contention.

¶ 51    Defendant argues that, nevertheless, there is nothing in the record to confirm that he was aware that he had a right to a trial consisting of a 12-member jury. Defendant concludes that *Matthews* is therefore on point and *Dereadt* is distinguishable because the defense counsel specifically mentioned 6 versus 12 in the context of jury size. *Dereadt*, 2013 IL App (2d) 120323, ¶ 20.

¶ 52    We recognize that this case is closer to a defendant's acquiescence to his counsel's statements in open court. Nevertheless, counsel stated that he had discussed the jury-size issue with defendant, and the trial court squarely asked defendant whether the six-member jury was his choice. Later, the trial court again made sure that counsel and defendant had discussed the jury-size issue, again verifying it was defendant's choice to proceed with a six-member jury. Thereafter, the trial court informed the prospective jurors that it would be selecting a jury of 6, rather than 12. Even under *Matthews*, this showing is adequate because, at worst, defendant acquiesced and agreed to waive the full number of jurors. *Cf. Matthews*, 304 Ill. App. 3d at 419 (the defendant "neither agreed to nor acquiesced in a decision to waive the full number of jurors").

¶ 53    Moreover, in *Harper*, the appellate court determined that the defense counsel's statement in open court and in the defendant's presence that he was requesting a 6-member jury and affirmatively stating that she had spoken to the defendant and that he had decided to proceed with a 6-person jury demonstrated that the defendant was aware of his right to a 12-person jury. *Harper*, 2017 IL App (4th) 150045, ¶ 32. The situation in this case closely resembles the situation in *Harper*. Here, defendant's counsel informed the trial court that he had discussed the issue of jury size with defendant and defendant had chosen to proceed with a six-person jury. The trial court also specifically questioned defendant if it was his choice to proceed with a six-person jury, and defendant indicated that it was his choice. See *id.* ¶¶ 32-33. Accordingly, on this record, and despite defendant's contention to the contrary, it is clear that defendant was aware that his right to a jury trial included the right to a 12-person jury. It is also clear that defendant knowingly waived the right to a 12-person jury and knowingly chose a 6-person jury. Accordingly, we conclude that no error occurred.

¶ 54                              C. Other-Crimes Evidence

¶ 55    Defendant last argues that the trial court abused its discretion in allowing the State to present an excessive amount of unduly prejudicial other-crimes evidence. Specifically, defendant concedes that the evidence regarding the use of Merola's credit card was appropriate but argues that the evidence of Garza's card was improper and substantially more prejudicial than probative.

¶ 56    In general, evidence of other crimes is not admissible to show the defendant's criminal propensity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Other-crimes evidence may be admissible for any other purpose, such as demonstrating motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident. *Id.* However, even if the other-crimes evidence is offered for a permissible purpose, it may nevertheless be precluded if its prejudicial effect substantially outweighs its probative value. *People v. Pikes*, 2013 IL 115171, ¶ 11. The admissibility of evidence, including other-crimes evidence, rests within the trial court's discretion, and we will not disturb the trial court's judgment absent an abuse of that discretion. *Id.* ¶ 12.

¶ 57    Defendant argues that the Garza evidence had very little probative value because it did not show that defendant lacked authorization to use the credit card. Defendant argues that the State lacked evidence that defendant was present when the card was taken. Defendant acknowledges that, by contrast, the Merola evidence, which involved defendant's presence when Merola's card was taken out of his car, demonstrated the lack of authorization and was thus relevant to the issue of intent and lack of mistake. We disagree.

¶ 58    The relevance of the Garza evidence is its striking similarity to both the charged offense and the Merola evidence. In all three cases, the State showed that the victim's credit card was removed from the victim's vehicle, the credit card was taken to a gas station, and the credit card was used by defendant to buy cigarettes. The close similarity of the charged offense to both instances of other-crimes evidence made the other-crimes evidence extremely probative. The evidence showed that defendant was involved in essentially the same conduct in three instances, disproving defendant's claim that he believed he was authorized to use the cards and giving rise to the palpably reasonable inference that defendant was aware that the cards had been taken from vehicles and neither he nor his girlfriend were authorized to use them.

¶ 59    *People v. Illgen*, 145 Ill. 2d 353, 365 (1991), provides a useful framework for evaluating other-crimes evidence. Specifically, a court is to look at the probative value, the temporal relation between the charged offense and the other-crimes evidence, the similarity between the charged offense and the other-crimes evidence, and whether the prejudicial effect substantially outweighed the probative nature of the other-crimes evidence. *Id.*

¶ 60    Here, the other-crimes evidence was clearly probative as to defendant's intent and lack of mistake. In addition, the evidence was also so similar as to qualify as *modus operandi* evidence even if identity was not in issue. See *People v. Boyd*, 366 Ill. App. 3d 84, 93 (2006) (other-crimes evidence used to prove *modus operandi* must have a high degree of similarity between the facts of the other-crimes evidence and the charged offense; when used to prove intent or lack of mistake, general areas of similarity suffice). In *Boyd*, the State introduced other-crimes evidence that was so similar as to approach the level of a trademark, where the other-crimes evidence and the charged offense (both sexual assaults) showed that the defendant struck up a conversation with each victim, offered to drive the victim to her work, picked her up in her car, detoured and drove into an alley, began shaking his leg and told the victim he needed to urinate, exited the car, reentered the car with a gun that he then used to rob the victim, told the victim to lie on her stomach, and anally assaulted the victim. *Id.*

¶ 61    Here, similarly, the other-crimes evidence and the charged offense showed that the victim had left his or her wallet in his or her vehicle. When the victim returned to the vehicle, the wallet was missing along with the credit card it contained. The cards were then used at gas

stations[3] to buy cigarettes. In each case, the same black car (which was traced to defendant's mother) was captured on the gas station's surveillance footage at the time of the offense. The defendant also signed the receipt as the cardholder. In addition, the defendant's girlfriend was present in the other-crimes evidence as well as the charged offense. Thus, the Garza evidence was quite probative in light of its similarity to the charged offense and the Merola evidence.

¶ 62    The State established a close temporal relation between the other-crimes evidence and the charged offense, as all of the conduct occurred within a month. Generally, offenses which are close in time have greater probative value than those that are remote. *Illgen*, 145 Ill. 2d at 370. We cannot say that a one-month time period is too remote.

¶ 63    The similarity between the charged offense and the other-crimes evidence helps to ensure that it will not be used solely to prove the defendant's criminal propensities. *Id.* at 372. Here, the Garza and Merola offenses were so similar as to qualify as evidence of defendant's *modus operandi*.

¶ 64    Finally, the prejudicial effect of the evidence did not substantially outweigh its probative nature. First, the similarity of the offenses was extremely probative. Moreover, the evidence was presented sufficiently to demonstrate the similarity. Defendant complains that the Garza evidence emphasized that her card was stolen during her wedding celebration, and this emphasis indicated that defendant was simply a bad person. We disagree. While the offense happened to occur during Garza's wedding celebration, the evidence was still tailored to demonstrate the similarity to the charged offense and the Merola evidence.

¶ 65    For these reasons, we cannot say that the trial court abused its discretion in allowing the State to present the Garza evidence (and we note, again, that defendant concedes that the Merola evidence was proper).

¶ 66    Defendant relies on *Boyd* and *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), to support his contention that the Garza evidence was unduly prejudicial. In *Boyd*, the court concluded that, despite the possibility that the trier of fact had been lured to "declar[e] guilt on a ground different from proof specific to the offense charged," the similarity between the charged offense and the other-crimes evidence and their temporal proximity demonstrated that the prejudicial effect of the evidence could not substantially outweigh the probative value. (Internal quotation marks omitted.) *Boyd*, 366 Ill. App. 3d at 94-95. In *Bedoya*, the other-crimes evidence was simply unrelated to the charged offense and offered no similarities. The lack of similarity substantially undercut any probative value attached to it and meant that, because there was relatively a lot of detailed evidence presented, the prejudicial effect was enhanced. *Bedoya*, 325 Ill. App. 3d at 940-43. Here, by contrast, the striking similarity between the Garza evidence, the Merola evidence, and the charged offense mean that the evidence was strongly probative of defendant's intent and lack of mistake (and even *modus operandi*, notwithstanding the fact that identification was not at issue) and the risk of prejudice was relatively minimized. *Bedoya*, therefore, is distinguishable.

¶ 67    Even if the Garza evidence were improperly admitted, it was harmless beyond a reasonable doubt. The improper introduction of other-crimes evidence is harmless error where the defendant is neither prejudiced nor denied a fair trial due to its admission. *People v. Sims*, 2019

___

[3]In all of the conduct, defendant used the Itasca gas station, but in the charged offense, he also traveled to the Palatine gas station; the verdict in the unissued credit card charge offense (the Itasca gas station), however, was directed on motion of defendant.

IL App (3d) 170417, ¶ 30. Generally, even if the other-crimes evidence is erroneously admitted, it is harmless if there is substantial evidence of the defendant's guilt. *Id.* Finally, a jury instruction admonishing the jurors about the limited purpose to which they may use the other-crimes evidence substantially reduces the prejudicial effect of the admission of the challenged evidence. *Id.* ¶ 31.

¶ 68 Here, the evidence of defendant's guilt was overwhelming. The Merola evidence, which defendant does not challenge, clearly demonstrates that defendant knew that he was not authorized to use the cards purportedly given him by Kern. The striking similarity in the circumstances between the Merola evidence and the charged offense gives rise to the inference that defendant also knew that he was not authorized to use Fatigato's credit cards. Finally, the jury was given an appropriate limiting instruction before the Garza and Merola evidence was presented, and the instruction was repeated as part of the jury instructions at the end of the case. Thus, even if the Garza evidence were improperly admitted, its admission was harmless beyond a reasonable doubt. Accordingly, we reject defendant's final contention.

¶ 69                                        III. CONCLUSION
¶ 70 For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 71 Affirmed.