No. 2-22-0061
Opinion filed June 29, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-391 |
| STEPHEN M. ADAMS, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justice Jorgensen concurred in the judgment and opinion.
Justice Hutchinson dissented, with opinion.

**OPINION**

¶ 1    Defendant, Stephen M. Adams, appeals from his conviction of two counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 1998)).[1] Defendant raises four issues on appeal: (1) the trial court erred in admitting other-crimes evidence pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) and section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)), (2) he was not proved guilty beyond a reasonable doubt, (3) his

---

[1]Section 12-16(d) was renumbered as section 11-1.60(d) of the Criminal Code of 2012 (720 ILCS 5/11-1.60(d) (West 2018)) by Public Act 96-1551, art. 2, § 5 (eff. July 1, 2011).

trial counsel provided ineffective assistance, and (4) the trial court erred in overruling his objection to the victim's rebuttal testimony. We affirm.

¶ 2                                      I. BACKGROUND

¶ 3      On January 8, 2019, defendant was charged by grand jury indictment with two counts of aggravated criminal sexual abuse. Count I provided that, on or between June 1 and September 1, 1998, defendant committed the offense of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 1998)) in that he committed an act of sexual conduct with A.S., who was at least 13 but under 17 years of age, by knowingly touching or fondling her vagina for the purpose of defendant's sexual gratification or arousal. Count II alleged the same except that the sexual act alleged was that defendant knowingly touched and fondled A.S.'s breasts. Both acts were alleged to have occurred outside defendant's house on Chesterfield Lane in Aurora while A.S.'s parents were inside the house.

¶ 4                                   A. Motion *in Limine*

¶ 5      On February 6, 2020, the State filed a motion *in limine* to introduce three sets of other-crimes evidence at trial. The State sought to introduce the other-crimes evidence to establish defendant's motive, intent, lack of an innocent frame of mind, and propensity to engage in sexual behavior with teenage girls.

¶ 6      The first set of other-crimes evidence involved A.S. and defendant, and the acts occurred at defendant's Chesterfield Lane home in Aurora on the same day as the charged offenses. In the course of the charged conduct, which included fondling A.S.'s breasts and buttocks, defendant allegedly also invited A.S. to touch his erect penis and told her it was because "it like[d] [her]." The State explained that the reason this conduct was not charged in the indictment as attempt was that an attempt charge was beyond the applicable limitations period.

¶ 7     The second set of other-crimes evidence also involved A.S. and occurred at her family's house and swimming pool in St. Charles (swimming pool evidence). The State alleged that before the charged incident, when A.S. was approximately 14 years old, defendant started becoming overly friendly with the children at gatherings with his family and A.S.'s family. The State alleged that this led to defendant touching and fondling A.S. at her family's home in St. Charles. The State alleged that "[t]his activity continued at the St. Charles residence and included defendant touching and fondling A.S. on her breasts and vagina while he swam with children in the A.S. family swimming pool." This conduct was the subject of separate pending charges in Kane County. The State argued that the evidence showed that defendant "committed the same type of behavior against A.S. in the months leading up to the [charged conduct]" and argued that the evidence was admissible for propensity purposes under section 115-7.3 of the Code because defendant's alleged conduct was "essentially a continuing narrative of a single course of action" that "lasted for a year or two and [took] place in different locations" and "involve[d] the same victim and same type of behavior by *** defendant."

¶ 8     The third set of other-crimes evidence concerned another victim, E.O., and took place in May 2016 in Will County (plea evidence).[2] E.O. was a foreign exchange student from Sweden whom defendant was hosting at his home in Plainfield. In the State's motion *in limine*, it alleged that, while E.O. was living in defendant's home, defendant "would get uncomfortably close to E.O., touch her on her arms and belly, and kiss her neck." Defendant was alleged to have "frequently told E.O. that she looked pretty, but never did this when his wife was around." On a single occasion, defendant allegedly touched E.O.'s stomach with his hand, and E.O. told him "not

---

[2]As noted below, this conduct was the subject of a September 2017 guilty plea.

to touch her 'fat,' " to which defendant "responded by lifting her shirt and stating he liked it because he liked women who were not skinny." The State's motion further alleged that defendant tried to kiss E.O., fondled her breasts and buttocks, told her that "they should have crazy fun," and then pressed his body against hers. E.O. could feel what she described as his "man parts" through his sweatpants. E.O. left defendant's house that same month.

¶ 9     Defendant's conduct against E.O. led to a three-count indictment in Will County (case No. 16-CF-2153), charging defendant with, *inter alia*, aggravated criminal sexual abuse. On September 22, 2017, defendant pled guilty to an amended charge of attempted criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2016)) of E.O.

¶ 10    On February 12, 2020, defendant responded to the State's motion *in limine*. As to the swimming pool evidence, defendant argued that it involved pending charges, that the probative value of that other-crimes evidence was outweighed by its prejudicial impact because he was presumed innocent, and that he could not rebut the allegations without forgoing his constitutional right against self-incrimination. Regarding the plea evidence, defendant argued that the evidence was inadmissible for the purpose of propensity because the conduct against E.O. occurred 18 years after the offenses alleged in the indictment. He asserted that the prejudicial impact of the plea evidence outweighed whatever minimal relevance the evidence had. Defendant did not respond to the State's first set of other-crimes evidence, which allegedly occurred during the course of the charged conduct.

¶ 11    On February 18, 2020, the trial court held a hearing on the State's motion *in limine*. The State began the hearing by clarifying that its motion "can really be argued in three categories rather than two. One is kind of a subcategory." The State explained that there were "two parts of the A.S. story" that it sought to admit: the evidence where defendant asked her to touch his penis on the

same day as the charged conduct in the instant case and the swimming pool evidence. It described the former evidence as "probably the easiest of the issues."

¶ 12 The State then explained the swimming pool evidence in more detail, first noting that A.S. and her family were members of the same church as defendant. A.S.'s family would host church gatherings at their home in St. Charles, and they had a swimming pool on their property. The State alleged that defendant would swim in the pool and would "seem to gravitate toward the children in the pool." At first, A.S. thought that the contact from defendant in the pool was accidental, but the contact turned into "essentially groping of her body parts." Defendant also told A.S. that she was pretty and special and that he liked her. The State argued that this incident was related to the subject matter of defendant's current indictment and had occurred in relatively close proximity, having taken place about one year prior.

¶ 13 In addition to the other-crimes swimming pool evidence, the State described a separate incident involving A.S., where defendant had A.S. over to his house to babysit his children and drove her home later that night.[3] A.S. was under the impression that defendant and his wife would be out of town for a couple of days and she planned to stay overnight, but they returned early. A.S. was in pajamas when defendant returned home that night, and, in the presence of A.S. and his wife, defendant made a comment about the sex lives of rock stars. Later, while driving A.S. home, defendant tried to fondle her and invited her to touch his penis.

¶ 14 Turning to the plea evidence, the State noted that defendant's conduct against E.O. occurred when she was close in age (16 years old) to the age A.S. was when the charged offense

---

[3]The babysitting and car ride incidents were not described in the State's written motion *in limine*.

occurred (15 years old). Consistent with its written motion, the State described the particular incident that led to E.O. removing herself from defendant's household, including that defendant had told E.O she was pretty, kissed her on the neck, fondled her breasts and buttocks, told her they should have "crazy fun," and pressed his body against E.O., causing her to feel defendant's "man parts" rubbing against her through his sweatpants. The State related that it had contacted E.O. and that she was willing to travel from Sweden to testify to defendant's conduct. The State argued that, although the gap between defendant's alleged conduct against A.S. and E.O. was 18 years, the similarity between the incidents supported allowing introduction of the plea evidence.

¶ 15    The trial court granted the State's motion *in limine*, explaining as follows. First, defendant was charged with aggravated criminal sexual abuse, which was a qualifying offense under section 115-7.3(a) of the Code (725 ILCS 5/115-7.3(a) (West 2018)). The court continued:

> "With respect to weighing the probative value of the evidence against any undue prejudice to [defendant], [section 115-7.3 of the Code] points out and the Court may consider, one, proximity in time to the charged or predicate offense, two, the degree of factual similarity to the charged or predicate offense, or other relevant facts and circumstances.
>
> Having considered the case law that addresses these matters, I think that as to the time frame between the events alleged in the indictment in this matter having occurred sometime in 1998 and the events in Will County that occurred in 2016, while it is an 18-year difference, *** I think that the proximity in time is permissible here.
>
> With respect to the other issue as to the Will County matter with E.O. occurring after the charged offense, again, based on the applicable case law, it is permissible for it to be *** allowed.

I think when I consider the various relevant facts and circumstances, similarity to the charged or predicate offense, *** [and] in weighing the probative value against the prejudice to [defendant], I believe that the evidence of these other matters would be more probative than unduly prejudicial.

So, I would grant the [State's] motion *in limine* to allow the evidence of the other matters.

So, *** understanding the defendant's concern with respect to the nature of the proceedings in Kane County, [ ] I believe it would still be permissible to have testimony regarding those events in this particular matter."

¶ 16    The trial court entered a written order that same day granting the State's motion *in limine* as to both the swimming pool and the plea evidence. The order did not describe or otherwise limit the alleged acts against either A.S. or E.O. that the State could introduce.

¶ 17                                B. Bench Trial

¶ 18    The matter proceeded to a bench trial on April 28, 2021. The State first called A.S.'s mother, Maria S., to testify. Maria testified that she moved with her husband and three children from Downers Grove to St. Charles sometime around 1994 or 1995. The St. Charles property was approximately 6½ acres and had a big, built-in swimming pool in the back. The swimming pool was directly behind the family room of the house.

¶ 19    Maria came to know defendant through her church. She and her family had attended a church in Warrenville both before and after the move, and the church had another location in North Aurora. The church conducted small group meetings called "flocks" once a week, and defendant was in her family's small group. The small groups would have Bible studies and informal get-togethers held at members' homes. Because Maria and her family had a large property, they had

some gatherings at their home where they would invite the entire church congregation. Defendant, along with his wife and five children, attended small groups with Maria and her family. Defendant also attended the larger gatherings at Maria's home.

¶ 20    The larger gatherings were held when the weather was good, so that people could swim. The people who would swim were "the older children and [defendant]," whereas most of the other adults were "goofing around with the kids playing basketball." Defendant was the only adult in the swimming pool, and she observed that he would single out A.S. in the pool.

¶ 21    Maria continued that A.S. babysat for defendant's children in the mid- to late 1990s, and she recalled that A.S. would babysit at both defendant's house and Maria's house. The last time A.S. babysat for defendant, she was supposed to spend the night at defendant's house—she had packed pajamas—but she returned home before midnight. Around the mid-1990s, A.S. "stopped wearing makeup, [ ] started wearing loose-fitting clothing *** [and] [w]as less outgoing."

¶ 22    While A.S. was attending college, she called Maria and asked if she could come talk to her privately. A.S. returned home (the family had since moved from St. Charles to De Kalb), and they spoke when nobody else was home. A.S. told Maria that "she had been molested by [defendant] repeatedly" and that "it had continued over a period of time." As a result of this conversation, Maria called the Department of Children and Family Services (DCFS), but neither she nor A.S. contacted the police at that time. Based on DCFS's instruction, Maria understood that she could not personally make a report because A.S. was over 18 by that time. Maria suggested to A.S. that she see a therapist, but A.S. "refused and said she didn't want to talk about it anymore."

¶ 23    The State next called A.S.'s younger sister, Margaret S., and she testified as follows. Margaret was 34 years old and worked as a registered nurse. She remembered defendant as a member of the family's church and believed he was involved in youth ministry, because he was

always around teenagers. She and her family would sometimes go meet defendant's family at defendant's house, and she identified a photograph of defendant's home.[4]

¶ 24 Margaret testified consistently with Maria that, in the mid- to late 1990s, defendant would attend summer gatherings at her family's St. Charles house. At the gatherings, Margaret remembered, the female adults typically were on the patio where the pool was not immediately visible and the male adults were often playing basketball on the court that was divided from the pool by a fence. The children either would be in the front yard for a tractor ride from Margaret's father or would be in the pool. Margaret was often in the pool, as was defendant. Other than defendant, adults were not usually in the pool. While defendant was in the pool, he "was always seeking out [A.S.], my sister. He would be putting his hands around her, tickling her, wrapping his arms around her."

¶ 25 When Margaret was around 10 or 12 years old, A.S. told her never to be alone with defendant. When she was an adult, A.S. told her about what happened between her and defendant, and Margaret called DCFS.

¶ 26 A.S. testified as follows. She was 38 years old, born on October 22, 1982. In addition to her younger sister, Margaret, she had an older brother, Blake, while growing up. Blake had died shortly before she turned 18.

¶ 27 As a child, she attended a private elementary school, a public middle school in St. Charles, and was homeschooled during high school. She believed that, as a result of homeschooling during

---

[4]The photograph appears to be of defendant's Chesterfield Lane home from the perspective of the street in front of the house, but there was no testimony at trial by Margaret explicitly identifying it as such.

high school, it was harder for her to distinguish among her high school years and it may have been easier if she had had "milestones like homecoming, that sort of thing." A.S. obtained her driver's license on her sixteenth birthday, which was October 22, 1998. After high school, she attended community colleges before attending and graduating from Northern Illinois University in the early 2000s.

¶ 28    While living in St. Charles, A.S. met defendant through the North Aurora church that she and her family attended. She came to know defendant's family and babysat for the children at both her and defendant's home. She mostly babysat at her house, doing so between three and six times. When she babysat at her house, defendant would drive his four boys over for her to watch. When defendant dropped his children off, he would not leave, and he often came with swim trunks and swam in the pool.

¶ 29    In 1996 and 1997, defendant and his family also attended gatherings that A.S.'s parents hosted at their home. Defendant would "almost invariably" be in the pool with her and other children during gatherings at the family's St. Charles home. Other adults were generally not in the pool. When defendant was in the pool, his actions initially seemed "benign," like "playing like water polo or tickling." She explained defendant's tickling of her as "[t]ouching, especially in the torso area." He would poke, grab, and tickle her, both above and below the water level.

¶ 30    Defense counsel objected because A.S was testifying to other-crimes evidence that counsel had previously objected to at the State's motion *in limine*. The trial court overruled the objection.

¶ 31    A.S. continued that defendant's touching in the pool progressed. While she initially thought his touching felt "like normal rough housing," in that the touching of her breast or butt would have been unintentional, it became clear to her that his touching of "more sensitive areas" was deliberate, because "it happened a lot more than it could happen by accident." By touching her

"more sensitive areas," A.S. meant defendant deliberately grabbed her on her midsection, butt, vagina, and breasts. He touched her breasts and vagina on "numerous instances." The touching occurred over her bathing suit. On one occasion, defendant pulled her swimsuit, exposing her pubic hair; she was "pretty mortified." In addition to the touching that occurred at the gatherings at her home, defendant would also tell her how pretty she was.

¶ 32     A.S. testified to another incident that occurred during one of the church events at her home. She and Blake took a walk to get away from the event, and defendant joined them. Blake was 17 years old at the time. Blake asked defendant, "do you mind if I smoke." Defendant's "retort" was "do you mind if I touch your sister, which he said sort of aggressively." A.S. thought her brother may have thought it was a joke because he "laughed it off awkwardly." Defendant also said "dude, your sister is really hot."

¶ 33     A.S. then testified to the incidents related to the charged conduct in this case. During the summer of 1998, before A.S. got her driver's license in October 1998, she, her parents, and her sister went to defendant's house for a weekend cookout. It was a social gathering and not a church event. She and the other children were playing in the backyard while the adults were inside. At some point, defendant came outside and took her to the side of the house by motioning that he had to talk to her about something. He took her to the right side of the house, from the perspective of looking at the house from the backyard. She could not see the other children, who were on the jungle gym, from where they were standing at the side of the house, although she could hear them sometimes. At the side of the house, A.S. noticed an "electrical or water meter box."

¶ 34     The State showed A.S. People's exhibits 5 and 6, which were photographs depicting the side of defendant's home, including the electrical box that A.S. remembered. A.S. confirmed that

the photographs accurately showed the side of defendant's home where the charged abuse took place.

¶ 35    A.S. testified that, when defendant got her to the side of the house, he began to touch her and told her that she was pretty. She recalled verbally rejecting his advances and trying to pull away, but defendant pulled her back towards him. Defendant continued his advances, "and it was basically what happened in the pool but without being submerged in water." He started to rub her back and proceeded to grab her thighs and butt, and he tried to touch her vagina. He put his hands on her vagina over her clothes. He also put his hands on her chest. He told her that he liked her and that she was special. She was scared and told him no; she told him she wanted to leave. He responded that everything was fine, and he tried to pull her hand towards his groin area. Defendant had a "very prominent erection[,] and he could tell that I was scared," because he said "don't worry, it's 'cause it likes you." She eventually pulled away and ran back to the backyard.

¶ 36    A.S.'s testimony turned to the last time she babysat for defendant's children at his Chesterfield Lane home. At the start of this line of testimony, defense counsel objected based again on the defense's objection to the State's motion *in limine*, and the trial court overruled the objection. A.S. continued that the last time she babysat for defendant was after the incident at the side of defendant's house but before she got her driver's license. A.S. believed that her father drove her to defendant's house, and she planned to stay overnight at defendant's because defendant and his wife were not supposed to return home until the following morning.

¶ 37    Contrary to her expectation, defendant and his wife returned home that same evening around 11 or so. A.S. did not end up staying overnight; defendant drove her home after a debate between him and his wife over who should drive her. She rode in the passenger seat, and she was alone with defendant in the car. While driving her home, defendant began to grope her by rubbing

her left thigh with his right hand. He then touched her vagina over her pajama pants. A.S. tried to pull away and said no, but he then tried to "literally get in [her] pants," and she more aggressively turned towards the door. He then asked her to touch him, and she said no. Defendant eventually dropped her off at home.

¶ 38    The next day, A.S. did not tell her parents about what had happened in the car, and she did not report the incident to the police. She did not make a report at the time because she worried that she would not be believed and because of other "pressing life traumas" in the following years, including the death of her older brother and her grandparents.

¶ 39    A.S. told her mother about defendant's conduct several years later, around 2000 or 2002, when she was attending college at Northern Illinois. Her mother asked her to report the incident to the authorities, but she did not tell the police because she still did not think that she would be believed. She also did not want to talk to anybody else about it, "much less a stranger, much less a man." It had been difficult enough to talk to her mother about it. She also thought that defendant was a "higher ranking person in church and smart, well educated," and she concluded that people would believe him and not her. A.S. also refused to go to therapy at the time, but she did end up talking to her mother's pastor at her mother's suggestion. The pastor suggested reporting to the authorities, but he did not shame her for not doing so.

¶ 40    After college, A.S. became an educator in California. Part of the mandatory training for educators included an online course that depicted scenarios in an effort to help educators identify grooming behaviors and children at risk of abuse. In response to the training, A.S. experienced "a pretty intense PTSD attack and started to question a lot of things" involving her past with defendant. She felt guilty that she had still not reported defendant's conduct against her, and "at that point it was abundantly clear" that she had to report. She resolved to "do something about it,"

but when she looked up the law in Illinois, she realized she "was too old"; "the statute of limitations in Illinois had expired." Sometime thereafter, she learned that the law had changed regarding the limitations period, and she told herself she could fulfill her promise to herself. Therefore, in 2018, she traveled to Illinois to file a report at the Aurora Police Department.

¶ 41    On cross-examination, A.S. testified that she did not return to defendant's Chesterfield Lane home following the acquisition of her driver's license in October 1998. She admitted that she wrote in her statement to police that the touching became worse when she was 16 or 17. A.S. testified that she was wrong about those ages and that the touching actually became worse when she was 15 and 16. On redirect examination, A.S. clarified that, upon further thought after she returned to California, she realized she had made a mistake in her statement, and she contacted the police who initially interviewed her to amend by "[a]bout a year or two" her age at the time of the incidents.

¶ 42    Terrance S., A.S.'s father, testified as follows. He knew defendant through church. When defendant attended gatherings at his home, he noticed that defendant migrated toward the children in the pool and that he paid particular attention to A.S.

¶ 43    Terrance had been to defendant's home for both social and church gatherings. One particular time stuck out in his mind. He was at defendant's home with his and defendant's families. For most of his visit, he was in the living room of the house. Defendant showed Terrance parts of the house, including the basement and his office. Defendant's office had special "Cat 5" wiring for his computer system. At the time, the wiring was "very high tech."

¶ 44    At some point during the visit, Terrance went outside to check on the children, and he found A.S. at the side of the house with defendant. From the vantage point of looking at the back of the house, they were on the right side, which was by the air conditioner unit. He found the two

of them alone, and when he found them, they started moving toward the backyard. Terrance noticed that defendant had "a full erection" and that he was wearing "gray warmup pants with pockets." On cross-examination, defense counsel did not question Terrance about what he saw at defendant's Chesterfield Lane home, instead asking him only about a gathering at his home that defendant attended.

¶ 45    Terrance identified People's exhibits 7 and 8, which respectively were photographs of the back entryway off the kitchen and of the side of the house, and the photographs were admitted into evidence. The side of the house depicted in People's exhibit 8 was where he found defendant and A.S., and the photograph was consistent with People's exhibit 5, which was a photograph identified by A.S. as the side of defendant's Chesterfield Lane home where the abuse occurred.

¶ 46    Before resting, the State notified the trial court that, despite its efforts to obtain E.O.'s testimony, it would not be calling E.O. to testify to the evidence described in its motion *in limine*. It explained that E.O. was unable to travel due to the pandemic, because she feared she would not be allowed back into her country.

¶ 47    Defendant first called his son, Matthew Adams, who testified as follows. Matthew was 32 years old, and he would have turned 10 years old in 1999. He had three living siblings, all younger than him. When asked if he knew A.S.'s family, he "recognize[d] the name," but he "wouldn't know them if [he] walked down the street." He did not remember them ever coming to his home. He had multiple babysitters when he was young, but he did not recall A.S. ever babysitting him. He also did not recall A.S.'s home. On cross-examination, he flatly denied that A.S. ever babysat for him or his siblings.

¶ 48    Defendant's wife, Christine Adams, testified that she knew A.S.'s family through church. Christine recalled going to A.S.'s home on two occasions, but she did not recall A.S.'s family ever coming to defendant's home. She did not recall whether defendant swam in A.S.'s family's pool.

¶ 49    On cross-examination, Christine denied that A.S. or any member of A.S.'s family ever babysat for her family, whether at her house or at A.S.'s house. She denied that A.S. was ever supposed to stay overnight while babysitting, and she denied that defendant had made an "off-color joke about rock stars" in front of A.S. the night A.S. was allegedly supposed to stay overnight. Christine denied that A.S. ever needed a ride home, but she testified that, if A.S. had needed a ride, she would have offered to drive A.S. home and would have been the one to drive her. Christine testified that she had always driven the female babysitters home.

¶ 50    Defendant testified as follows. He worked as an information technology director in the mid-1990s until 2002, a position that required him to travel to international and domestic locations 200 to 220 nights a year. He knew A.S.'s family through church, and he recalled having gone to A.S.'s house three or four times for various social events where the children would swim in the pool. At the gatherings, he talked with people, ate, and swam with his children. He denied that any church events occurred at his house.

¶ 51    Defendant was "reasonably certain" that neither A.S. nor her family were ever at his Chesterfield Lane home, testifying that he and his family did not move there until August 1999 and that he was no longer a part of the same church by the time he moved to Chesterfield Lane. Defendant continued that, before moving to the Chesterfield Lane home, he and his family had lived in a rental home on Camden Lane for two months after selling their home on Kelly Court in Aurora. He identified defendant's exhibit 2, which was a trustee's deed for the Chesterfield Lane home recorded August 6, 1999. The deed, which was for the transfer of the Chesterfield Lane

home from the Northern Trust Company to defendant and Christine, listed defendant's address as 1235 Camden Lane in Aurora. Defendant believed that the deed was recorded a few days after he actually moved into the home and that the move-in date was either August 1 or 2, 1999. He denied living at the house prior to August 1999, testifying that it was new construction and still being built then. Defendant agreed that the State's photographs of the Chesterfield Lane home depicted the home he moved into in August 1999.

¶ 52    Defendant denied that A.S. ever babysat his children at either his or her home. He stated that having A.S. babysit his children did not make sense, because they lived 45 minutes northwest. Defendant had other babysitters when they were needed.

¶ 53    On cross-examination, the State asked defendant whether he had Cat 5 wiring at his Chesterfield Lane home, and he first answered the question with "[y]es, that's not where we lived." The State continued to ask defendant about the wiring, and defendant answered, "[t]he Chesterfield house did have it but we didn't live there," before finally answering "[y]es, absolutely," to whether such wiring was present at his Chesterfield Lane home.

¶ 54    The State also questioned defendant about E.O., and defendant confirmed that she was an exchange student who lived with him around 2016. Defense counsel objected to the questioning as beyond the scope of direct examination. The trial court overruled the objection. Defendant admitted that he filled out the application to host an exchange student and that he had a gender preference for the student: female.

¶ 55    The State then confronted defendant with People's exhibit 9, a certified copy of his plea of guilty from the Will County case involving E.O. Defendant read aloud the information filed with the guilty plea, which was that, with "the intent to commit the offense of criminal sexual abuse, *** [he] performed a substantial step toward commission of that offense in that [he] attempted to

commit an act of sexual conduct by attempting to touch the breast of E.O., a minor, by use of force for the purpose of [his] sexual gratification."

¶ 56   After the defense rested, the State called A.S. in rebuttal. A.S. confirmed that she had babysat for defendant's children. Concerning the last time she babysat for defendant's family, the State asked her whether a discussion occurred among her, defendant, and Christine over her needing a ride home. Defense counsel objected to the question as "already covered," and the trial court overruled the objection. A.S. testified that in the presence of Christine defendant had made a joke about rock stars and sex. Christine offered to drive A.S. home, but after a "prolonged debate" between Christine and defendant, defendant drove her home. Christine had been insisting that she drive, and A.S. was hoping that she would. Defendant was also very insistent on driving, and that seemed to bother Christine.

¶ 57   In closing, defense counsel argued that, contrary to the State's argument, the date of the offense in this case mattered because the age of A.S. mattered. Counsel argued that the trustee's deed showed that defendant closed on the Chesterfield Lane home in August 1999, and A.S. would have turned 17 years old in October 1999. Counsel concluded that, if the alleged events occurred after A.S. turned 17, there was no offense.

¶ 58   The trial court found defendant guilty of both counts of aggravated criminal sexual abuse. In reaching its findings, it found A.S. to be credible as to the incidents to which she testified involving her and defendant. It did not mention the plea evidence. On June 8, 2021, defendant filed a motion to reconsider and/or for new trial, and the trial court denied defendant's motion on

January 20, 2022. That same day, defendant was sentenced to 48 months of sex offender probation and 90 days' imprisonment. Defendant timely appealed.[5]

¶ 59                                    II. ANALYSIS

¶ 60    On appeal, defendant contends that the trial court erred in admitting the State's other-crimes evidence under both Rule of Evidence 404(b) and section 115-7.3 of the Code. Additionally, defendant contends that the State failed to prove him guilty beyond a reasonable doubt, that his trial counsel was ineffective for failing to object to certain testimony, and that the trial court erred in overruling his objection to A.S.'s rebuttal testimony. We address his arguments in turn.

¶ 61                            A. Other-Crimes Evidence

¶ 62    We begin with defendant's contention that the trial court erred in admitting the State's other-crimes evidence. Whether to admit other-crimes evidence is a decision that rests in the sound discretion of the trial court. *People v. Bochenek*, 2020 IL App (2d) 170545, ¶ 56. An abuse of discretion occurs where the trial court's evaluation is arbitrary, fanciful, or unreasonable. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). Under the abuse-of-discretion standard, reversal is not required where reasonable minds can disagree over the decision to admit other-crimes evidence. *Id.* at 186.

¶ 63    Defendant challenges the following other-crimes evidence adduced at trial: the swimming pool evidence, namely A.S.'s testimony that defendant fondled her in her family's pool in St. Charles, and the plea evidence, namely defendant's acts with E.O. as specified in the information

---

[5]On March 8, 2022, over the State's objection, the trial court granted defendant's motion to stay his incarceration pending appeal.

defendant read while pleading guilty to attempted criminal sexual abuse. Defendant does not challenge A.S.'s trial testimony that, while driving her home from babysitting, he touched her vagina and tried to "literally get in [her] pants" nor her testimony, during her description of the charged conduct, that he tried to pull her hand toward his "groin area" while he had a "very prominent erection."

¶ 64    Defendant first argues that the challenged other-crimes evidence should not have been admitted pursuant to Illinois Rule of Evidence 404(b) (eff. Jan 1, 2011) to show motive, intent, or absence of mistake. Defendant additionally argues that the challenged other-crimes evidence should not have been allowed under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) to show propensity. Regarding the swimming pool evidence, defendant asserts that our supreme court has instructed trial courts to be cautious in admitting other-crimes evidence to show propensity and engage in a meaningful assessment of the evidence's probative value versus its prejudicial effect. *Donoho*, 204 Ill. 2d at 186. He contends that the trial court in this case failed to explain its ruling and "failed to engage in even a cursory assessment" of the other-crimes evidence. He argues that the trial court's failure to make a meaningful assessment is itself reason to reverse his conviction and grant him a new trial.

¶ 65    Defendant continues that, beyond the trial court's failure to make a meaningful assessment of the swimming pool evidence, the conduct at issue occurred at least a year before the charged conduct and that the conduct was not part of a "continuing narrative." Further, he argues that the conduct bore little similarity beyond involving A.S., with the location and circumstances being incomparable to the charged conduct. Last, he argues in a conclusory fashion that the admission of the swimming pool evidence implicated his fifth amendment right against self-incrimination because of his pending charges in Kane County.

¶ 66    Turning to the plea evidence, he argues that attempted criminal sexual abuse is not a listed offense under section 115-7.3 of the Code and therefore his guilty plea to attempted criminal sexual abuse of E.O. was not admissible under the Code's plain language. He continues, claiming that, even if the statute permitted evidence of attempted criminal sexual abuse to show propensity, his guilty plea did not bear the necessary threshold of similarity to the charged conduct, emphasizing that E.O. never testified at trial as to the circumstances of defendant's attempt offense. He also stresses that his conviction was of an offense that occurred in 2016, nearly two decades after the charged conduct, and he concludes that his guilty plea was to conduct that was not proximate in time to the charged conduct. As explained herein, we reject defendant's arguments because the admission of the swimming pool evidence was not an abuse of discretion and the admission of the plea evidence was harmless error.

¶ 67    The term "other-crimes evidence" encompasses misconduct and criminal acts that occurred before or after the alleged charged conduct, including acts of misconduct for which the defendant was not charged or convicted. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 28. In general, other-crimes evidence is not admissible to show a defendant's criminal propensity. *Bochenek*, 2020 IL App (2d) 170545, ¶ 56. Other-crimes evidence may be admissible for other purposes, such as to show a defendant's motive, opportunity, intent, or absence of mistake. *Id.*; see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). In sex crime cases, other-crimes evidence is also admissible to corroborate the victim's testimony concerning the offense charged. *People v. Foster*, 195 Ill. App. 3d 926, 949 (1990). Even if offered for a permissible purpose under Rule of Evidence 404(b), other-crimes evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Bochenek*, 2020 IL App (2d) 170545, ¶ 56; see Ill. R. Evid. 403 (eff. Jan 1, 2011).

¶ 68    As an exception to the general rule, section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) permits the admission of other-crimes evidence in certain cases to show a defendant's propensity to commit specified offenses. *People v. Boyd*, 366 Ill. App. 3d 84, 90 (2006). In enacting section 115-7.3, the legislature "intended to single out sex offenders *** in recognition of the propensity of sex offenders to repeat their crimes." *People v. Childress*, 338 Ill. App. 3d 540, 549 (2003). Although other-crimes evidence is unquestionably prejudicial to a defendant (*People v. Lamonica*, 2021 IL App (2d) 200136, ¶ 51), the danger of undue prejudice in a section 115-7.3 case is "less pronounced" than in other common-law other-crimes cases (*People v. Walston*, 386 Ill. App. 3d 598, 620 (2008)). That danger is lessened because the legislature's enactment of section 115-7.3 cut against the general rule that other-crimes evidence is *per se* unduly prejudicial by making the use of other-crimes evidence proper to show a defendant's propensity. *Id.* at 619-20.

¶ 69    The offenses to which section 115-7.3 applies include aggravated criminal sexual abuse. 725 ILCS 5/115-7.3(a)(1) (West 2018). When a defendant is accused of one of the listed offenses in section 115-7.3(a), evidence of the defendant's commission of another one of those listed offenses is admissible for "any matter to which it is relevant." *Id.* § 115-7.3(b). "Any matter" specifically includes a defendant's propensity to commit the listed sex offenses. *Donoho*, 204 Ill. 2d at 176.

¶ 70    Section 115-7.3 is not, however, without limitation: It incorporates the general rules of evidence (725 ILCS 5/115-7.3(b) (West 2018) (conditioning admissibility on whether the evidence is otherwise admissible under the rules of evidence)) and expressly provides for the weighing of the evidence's probative value against its undue prejudice to the defendant (*id.* § 115-7.3(c) (providing that a court may consider the proximity in time to the charged offense and the degree

of factual similarity to the charged offense)). *Walston*, 386 Ill. App. 3d at 611. Other-crimes evidence must bear at least some threshold similarity to the charged offense, and as the factual similarities to the charged conduct increase, so too does the evidence's probative value. *Donoho*, 204 Ill. 2d at 184.

¶ 71    Furthermore, our supreme court has urged trial judges to be cautious in the admission of other-crimes evidence for the purpose of showing propensity, advising them to engage in a "meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Id.* at 186. Our supreme court's admonishment has been interpreted as requiring that the trial court explicitly balance the evidence's probative value against its prejudicial effect before admitting propensity evidence under section 115-7.3, although the failure to do so does not require automatic reversal. See *People v. Reber*, 2019 IL App (5th) 150439, ¶¶ 85-86; *People v. Groel*, 2012 IL App (3d) 090595, ¶¶ 42-44; *People v. Johnson*, 406 Ill. App. 3d 805, 811-12 (2010); *Boyd*, 366 Ill. App. 3d at 94-95.

¶ 72    Turning first to the swimming pool evidence, we agree with defendant that, for purposes of showing his criminal propensity pursuant to section 115-3.7, the trial court did not explicitly make a meaningful assessment of the evidence, on the record. The only specific reference the trial court made to those acts was to say that it understood "defendant's concern with respect to the nature of the proceedings in Kane County, but I believe it would still be permissible to have testimony regarding those events in this particular matter." This comment was not a reference to the balance between the probative value and the prejudicial effect of the evidence but instead was in reference to defendant's argument that, given his pending charges in Kane County, he could not rebut the evidence without forgoing his right against self-incrimination. The rest of the trial court's analysis was directed at the plea evidence.

¶ 73    Nevertheless, we disagree with defendant that the trial court's failure to conduct a meaningful assessment on the record before admitting propensity evidence was reversible error. See *Boyd*, 366 Ill. App. 3d at 95 (applying harmless error analysis). In *Boyd*, the trial court analyzed the probative value of the other-crimes evidence, but it never mentioned the risk of undue prejudice to the defendant. *Id.* at 94. Despite the trial court failing to conduct a full, explicit balancing test, the appellate court found that the probative value of the other-crimes evidence to prove propensity was strong, and it did not see the risk of unfair prejudice as substantially outweighing the probative value. *Id.* at 95.

¶ 74    Like in *Boyd*, the court in *Johnson*, 406 Ill. App. 3d at 812, 818-19, examined for harmless error the admission of other-crimes evidence to show propensity. Unlike the facts in *Boyd*, the trial court's failure to conduct an explicit balancing test was not the only error found in *Johnson*: The trial court also found significant dissimilarities between the charged conduct and the conduct at issue in the other-crimes evidence. *Id.* at 812. There, the trial court concluded that the combination of significant dissimilarities and the failure to conduct a balancing test was error. *Id.*

¶ 75    In *Reber*, 2019 IL App (5th) 150439, the court applied a harmless error analysis where the defendant argued that the trial court's failure to assess the prejudicial value of certain photographs admitted pursuant to section 115-7.3 constituted plain error or, alternatively, that his trial counsel was ineffective for failing to raise the issue in a posttrial motion. *Id.* ¶¶ 81-85. The court held that the trial court's omission of the balancing test with respect to the photographs at issue was harmless error, explaining that the trial court performed the balancing test on all other photographs admitted, that trial judges are presumed to know the law, and that the trial court based its holding on its "careful concern for and consideration of all statutory requirements for admission of the photographs." *Id.* ¶ 85. Apparently for the sake of both its plain-error and ineffective-assistance

analyses, the court proceeded to analyze whether "the 'error' was of such magnitude that the defendant was denied a fair trial." *Id.* ¶ 86. Explaining that the evidence against the defendant was strong, it found no reasonable probability that the outcome would have been different absent the " 'error.' " *Id.*

¶ 76    Last, the court in *Groel* held that the trial court did not abuse its discretion in admitting other-crimes evidence to show the defendant's criminal propensity, where the defendant had been indicted on multiple counts of criminal sexual assault involving three different minors and the other-crimes evidence was of his ongoing, long-term sexual relationship with another minor. *Groel*, 2012 IL App (3d) 090595 ¶¶ 1, 5, 44. The defendant had argued that the trial court failed to conduct a balancing test of the propensity evidence's probative value relative to its prejudicial effect, but the court explained that the failure to conduct a proper balancing test was not necessarily reversible error. *Id.* ¶ 42. Like the *Reber* court, the *Groel* court stated that a trial judge is presumed to know the law unless the record indicated otherwise. *Id.* ¶ 43.

¶ 77    Consistent with this case law, we must first examine whether the trial court reasonably could have found that the probative value of the swimming pool evidence to show defendant's criminal propensity was not substantially outweighed by its prejudicial effect. If we answer in the affirmative, then the trial court's failure to conduct a meaningful assessment would not render the ultimate admission of the swimming pool evidence an abuse of discretion, *i.e.*, the failure to do an explicit balancing test would be harmless. This was the approach in *Boyd* and *Groel*. The *Boyd* court examined the probative value of the propensity evidence against its prejudicial effect and determined that, on balance, there was no harm in admitting the evidence, despite the trial court's failure to conduct an explicit balancing test. *Boyd*, 366 Ill. App. 3d at 95. The *Groel* court did not even employ the term "harmless error," finding simply that the trial court did not abuse its

discretion in admitting the other-crimes evidence, despite the defendant's argument that it failed to conduct a balancing test. *Groel*, 2012 IL App (3d) 090595, ¶¶ 42-44. In reaching its holding, the court relied on the factual similarities between the other-crimes evidence and the charged offenses and the presumption that the trial judge followed the law. *Id.* ¶¶ 43-44.

¶ 78   Although *Reber* and *Johnson* looked beyond whether the trial courts erred in admitting the other-crimes evidence and toward the admissions' effect on the outcome of the trials, they did so in different contexts. The *Reber* court did so in the context of plain-error and ineffective-assistance arguments (*Reber*, 2019 IL App (5th) 150439, ¶¶ 82-86), and those analyses examine not only whether there was error but whether the error affected the fairness of the trial itself (see *People v. Schoonover*, 2021 IL 124832, ¶ 27 (plain error applies when a clear or obvious error occurs and the evidence is closely balanced or the error is so serious that it affected the fairness of trial); *People v. Vega*, 408 Ill. App. 3d 887, 889 (2011) (ineffective assistance requires that, but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different)). The *Reber* court separately found the omission of the balancing test to be harmless error before additionally explaining that the " 'error' " was not so great as to deny the defendant a fair trial. *Reber*, 2019 IL App (5th) 150439, ¶¶ 85-86. We are not faced with plain-error or ineffective-assistance arguments here, at least not with respect to the admission of other-crimes evidence.

¶ 79   Importantly, in *Johnson*, the appellate court found significant dissimilarities between the conduct at issue in the other-crimes evidence and the charged offense in addition to finding that the trial court failed to conduct a meaningful analysis. *Johnson*, 406 Ill. App. 3d at 812. We have not yet analyzed the factual similarities of the other-crimes evidence in this case, and therefore *Johnson*'s guidance remains conditional: If we determine that the only reasonable conclusion for

the trial court to reach was that the evidence's risk of prejudice substantially outweighed its probative value, we will examine whether the erroneous admission of evidence affected the outcome of defendant's trial. See *Bochenek*, 2020 IL App (2d) 170545, ¶¶ 60-67 (finding that other-crimes evidence was properly admitted because the prejudice did not outweigh the probative value and explaining that, even if it had been improperly admitted, its admission was harmless beyond a reasonable doubt).

¶ 80    Here, we conclude that the trial court could have reasonably found that the probative value of the swimming pool evidence was not substantially outweighed by its prejudicial effect. The conduct at issue in the swimming pool evidence bore various similarities to the charged conduct in the instant case beyond simply involving the same victim, making it highly probative. In the swimming pool, defendant deliberately grabbed A.S.'s midsection, butt, vagina, and breasts. He touched her breasts and vagina on "numerous instances," and he touched her over her bathing suit. In addition to touching A.S., he told her during gatherings at the St. Charles house how pretty she was. Likewise, in the charged offense at the side of defendant's house, defendant touched A.S.'s breasts and vagina over her clothing, and he told her that she was special and pretty. A.S. herself even made the comparison between the pool incident and the charged conduct, describing the charged conduct as "basically what happened in the pool but without being submerged in the water."

¶ 81    In sum, the swimming pool evidence involved the same victim and substantially the same conduct and the conduct was alleged to have occurred within approximately one year of the charged conduct. See *Donoho*, 204 Ill. 2d at 186 (admission of other-crimes evidence was not unreasonable despite 12-to-15-year gap between the charged offense and the other conduct). Although the swimming pool evidence is undoubtedly prejudicial to defendant, section 115-7.3

was enacted to permit such propensity evidence (see *Childress*, 338 Ill. App. 3d at 549). Given the similarities outlined, the swimming pool evidence fit squarely within the legislature's intent to permit the State to show defendant's propensity to commit aggravated criminal sexual assault, and it was not the kind of prejudicial evidence that risked a factfinder convicting him "simply because it believes that he *** is a bad person." *Lamonica*, 2021 IL App (2d) 200136, ¶ 51. Nor did the swimming pool evidence result in a "trial within a trial," as the details here were limited to the similarities to the charged offense. See *Boyd*, 366 Ill. App. 3d at 94. Furthermore, limiting A.S.'s testimony to only the charged conduct would have made the incident appear isolated, unduly straining her credibility. In *People v. Tannahill*, 152 Ill. App. 3d 882 (1987), the court provided:

> "The trier of fact is entitled to view the sexual conduct within the context of the actual relationship between defendant and complainant. *** Limiting complainant's testimony to one incident would make the incident appear isolated. This limitation would place an unfair strain upon the credibility of complainant's testimony concerning the charged offenses. Moreover, the probative value of such evidence far outweighs any prejudicial effect on defendant." *Id.* at 887.

Accordingly, we hold that the admission of the swimming pool evidence to show defendant's criminal propensity was not an abuse of discretion.

¶ 82    Because we have found that the swimming pool evidence was admissible to show defendant's criminal propensity under section 115-7.3, we need not address whether it was admissible for another purpose. *People v. Carter*, 38 Ill. 2d 496, 504 (1967); *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 51. We therefore do not address whether it was error to admit the swimming pool evidence under Rule of Evidence 404(b) for purposes of intent, motive, or absence of mistake.

¶ 83    Before moving to the plea evidence,  we briefly touch on two other matters. First, we reject

defendant's additional contention that the swimming pool evidence implicated his fifth amendment

right against self-incrimination. His argument was undeveloped in his brief, consisting of one

paragraph with one citation of a case that did not involve a defendant's right against self-

incrimination. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)[6] (requiring citation of authority and

the record in argument). It is not clear from defendant's brief whether he argues that his fifth

amendment right was even violated. This court is not a repository into which an appellant may

foist the burden of argument and research. *Dibenedetto v. Dibenedetto*, 2019 IL App (3d) 180761,

¶ 20. As such, we deem his argument forfeited.

¶ 84    Second, we recommend that trial courts make an on-record, meaningful assessment of

other-crimes evidence of criminal propensity under section 115-7.3. A record of the trial court's

assessment will assist a reviewing court. In addition, an erroneous admission presents a strong risk

of reversal (see *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 31), and courts should conduct a

careful substantive analysis of propensity evidence's probative value against its prejudicial effect

instead of merely reciting the language of the balancing test. Although the trial court's failure to

conduct a meaningful assessment of the swimming pool evidence did not lead to an erroneous

admission here, our supreme court in *Donoho* prudently urged trial courts to engage in meaningful

assessments of other-crimes evidence to show propensity.

¶ 85    Turning to the plea evidence, we agree with defendant that it should not have been admitted

under section 115-7.3. Per the statute's plain language, section 115-7.3 permits the introduction of

---

[6]Rule 341(h)(7) is applicable to criminal cases per Illinois Supreme Court Rule 612(b)(9)

(eff. July 1, 2017).

evidence of only the listed offenses to show propensity (see 725 ILCS 5/115-7.3(a), (b) (West 2018)), and *attempted* criminal sexual abuse is not a listed offense. In fact, the statute makes no mention of attempt at all, and it is "well established that a statute that represents a departure from the common law should be narrowly construed in favor of those against whom it is directed." *People v. Dabbs*, 239 Ill. 2d 277, 288 (2010) (construing section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2008)) to preserve for the defendant all the possible protections of the rules of evidence that were consistent with the legislature's intent in creating the evidentiary exception). As such, we will not read into the statute an unlisted offense.

¶ 86    Although it was error to admit the plea evidence pursuant to section 115-7.3, we must still examine whether it was error to admit it under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). Below, the State sought to admit the evidence not only to show defendant's criminal propensity but also to show his intent, motive, and absence of mistake. If the evidence was admissible for one of these other purposes, then its admission was not an abuse of discretion. *Johnson*, 2014 IL App (2d) 121004, ¶ 51.

¶ 87    We agree with defendant that the plea evidence was erroneously admitted to show his intent, motive, or absence of mistake. Although the trial court heard details about defendant's conduct toward E.O. at the hearing on the State's motion *in limine*, the State was unable to call E.O. to testify at trial. As such, the evidence actually admitted at trial was simply a copy of defendant's 2016 guilty plea and his recitation of the information accompanying his plea. The plea and the information provided minimal factual detail of an offense occurring approximately 18 years after the charged offense. The facts adduced were simply that defendant had intended to commit criminal sexual abuse against E.O., a minor, in that he had taken a substantial step toward the commission of the offense by attempting to touch her breast by use of force.

¶ 88     We have previously found that a trial court abused its discretion in admitting a defendant's past convictions where those convictions "simply had no facts to determine the threshold similarity to the crimes charged." *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶¶ 78-79. But see *People v. Watkins*, 2015 IL App (3d) 120882, ¶¶ 47, 49 (where the defendant's intent to deliver was at issue in the case, the defendant's prior conviction of possession of cannabis with intent to deliver provided the "bare minimum" of information sufficient for the trial court to find a threshold similarity to the charged offense of unlawful possession with intent to deliver). In *Sundling*, the defendant had been charged with knowingly fondling two boys' penises for his sexual gratification, with the abuse allegedly occurring in 2002. *Sundling*, 2012 IL App (2d) 070455-B, ¶¶ 4, 6. In finding that the trial court abused its discretion in admitting the defendant's 1984 Cook County conviction of two counts of indecent liberties with a child and his 1997 Michigan conviction of attempted criminal sexual conduct, we noted that, for the Cook County conviction, the State provided only a certified copy of conviction and a docketing statement and, for the Michigan conviction, the only evidence gleaned from the conviction was that the defendant had engaged in sexual contact with a boy under age 13. *Id.* ¶ 79.

¶ 89     Here, the plea evidence did not describe in any significant detail the circumstances surrounding defendant's attempted criminal sexual abuse of E.O.. What limited detail the guilty plea provided actually showed dissimilarity between the offenses: the offense involving E.O. involved the use of force, which was not an element of the charged offense against A.S. Defendant's use of force to attempt the sexual abuse of E.O. reasonably could have evinced a different state of mind than he had in the charged offense against A.S. As such, we find not only that the evidence of defendant's guilty plea was analogous to the insufficient factual detail

accompanying the prior convictions in *Sundling* but also that the limited factual detail tended to show dissimilarity between the offense at issue in the plea evidence and the charged offense.

¶ 90     Even if the offense at issue in the plea evidence bore a threshold similarity to the charged offense, its probative value was low and its prejudicial value was high. As mentioned, the plea evidence was sparse on factual detail while adding the new element of force to the attempted sexual abuse, which could reasonably have shown a different intent or motive in defendant's attempted abuse of E.O. Importantly, in this case, we note, defendant's state of mind was not the critical dispute at trial. This case hinged on whether the trial court believed A.S.'s account that defendant actually committed aggravated sexual abuse at his Chesterfield Lane home, with defendant denying that A.S. was ever even present at his Chesterfield Lane home. *Cf. Johnson*, 406 Ill. App. 3d at 810 (explaining that, where a defendant claims the victim consented to the sexual assault, other-crimes evidence is relevant to prove the defendant's criminal intent or lack of an innocent frame of mind). Given the circumstances of this case, we find that the probative value of the plea evidence was severely limited as to the State's asserted permissible purposes under Rule of Evidence 404(b).

¶ 91     In addition, the offense at issue in the plea evidence occurred approximately 18 years after the charged conduct. Although the admissibility of other-crimes evidence cannot be based solely on the number of years elapsed between the other offense and the charged crime, the remoteness of the other crime to the charged crime will reduce its probative value. *People v. Illgen*, 145 Ill. 2d 353, 370 (1991). The trial court was thus faced with balancing the following: on the one hand, the plea was remote and provided minimal probative detail of defendant's intent, motive, or possible mistake; on the other hand, it was unquestionably prejudicial (*Lamonica*, 2021 IL App (2d) 200136, ¶ 51). The only reasonable conclusion on balance was that the prejudicial effect of the

plea evidence substantially outweighed the probative value, and we therefore find that the trial court abused its discretion in admitting the plea evidence.

¶ 92    Still, our analysis does not end here. Our final inquiry is whether the erroneous admission of the plea evidence was harmless error. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 28. Reversal is required only if the evidence is a material factor in the defendant's conviction; that is, the outcome of his trial would likely have been different had the evidence been excluded. *People v. Cavazos*, 2022 IL App (2d) 120444-B, ¶ 71. In addition, the risk of prejudice from other-crimes evidence is lessened in a bench trial. See *People v. Felton*, 2019 IL App (3d) 150595, ¶¶ 47-48 (noting that the prejudicial effect of other-crimes evidence "is almost exclusively discussed in terms of impact on a *jury*" (emphasis in original) and explaining that the law "presumes that a judge, unlike a jury, is not likely to find a defendant guilty simply because he or she is a bad person deserving punishment"); *cf. People v. Johnson*, 296 Ill. App. 3d 53, 63 (1998) (in resolving a challenge to the admission of the minor victim's hearsay statement in an aggravated criminal sexual assault case, stating that "[w]hile a technical error may have been committed, we cannot see how, in this bench trial, it caused any prejudice to the defendant").

¶ 93    Based on our consideration of the evidence adduced at defendant's bench trial, we find that the admission of the plea evidence was harmless. The trial court specifically found A.S.'s account credible, and A.S.'s testimony as to the charged conduct was corroborated not only by her father, who testified to finding A.S. and defendant alone at the side of defendant's home where the abuse allegedly occurred,[7] but also by the properly admitted swimming pool evidence involving her and

---

[7]The dissent substitutes its opinion of Terrance's credibility for that of the finder of fact. *Infra* ¶ 129. It disregards that Terrance's testimony corroborated A.S.'s testimony that she had

defendant. We already have determined that A.S.'s testimony of defendant's misconduct in the swimming pool was admissible to show defendant's propensity to commit aggravated criminal sexual abuse. In addition, A.S. testified to another proximate instance of defendant's similar sexual misconduct: his fondling of A.S. while driving her home from babysitting. Defendant has not challenged the admission of that testimony on appeal. In light of A.S.'s testimony of other instances of defendant's bad acts against her, which showed defendant's criminal propensity and corroborated her testimony of the alleged abuse, we cannot say that the erroneous introduction of one bad act involving E.O. was a material factor in his conviction. In other words, there was no reasonable probability that the outcome of defendant's bench trial would have been different had the guilty plea evidence been excluded.

¶ 94                                B. Sufficiency of the Evidence

¶ 95    In challenging the sufficiency of the evidence, defendant argues that the core issue was whether A.S.'s testimony that he abused her at his Chesterfield Lane home in the summer of 1998 was credible beyond a reasonable doubt. He argues that the State was required to prove that defendant committed the offense before A.S. turned 17, and he contends that no reasonable trier of fact could have accepted A.S.'s testimony that the assault occurred over the summer of 1998, because defendant and his family did not move to Chesterfield Lane until August 1999. Defendant directs us to the trustee's deed he admitted into evidence to establish that he did not live at the Chesterfield Lane home until August 1999. Defendant asserts that, viewing A.S.'s testimony in

_____

been with defendant at the side of his Chesterfield Lane house when defendant denied that she was ever at that house. It further ignores that, while Terrance did not testify that he had any reaction to finding defendant and A.S. together at the side of the house, he was not asked for his reaction.

light of the trustee's deed, the only reasonable conclusion to draw was that the assault never occurred in 1998.

¶ 96    In addition, defendant argues that the State misstated the law before the trial court when it argued that the date of the offense was not an element of the offense, directing us to section 111-3(a)(4) of Code (725 ILCS 5/111-3(a)(4) (West 2020)).

¶ 97    We reject defendant's arguments. On a challenge to the sufficiency of the evidence, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A factfinder's decision to accept testimony is entitled to great deference, although the factfinder's decision to accept testimony can be unreasonable and as such is not binding on a reviewing court. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19. The testimony of a single witness is sufficient to convict where the testimony is positive and credible, even when contradicted by the defendant. *People v. Gray*, 2017 IL 120958, ¶ 36.

¶ 98    In directing us to the trustee's deed recorded August 6, 1999, defendant provides strong evidence that the charged offense could not have occurred in the summer of 1998. The deed corroborates his testimony that he did not live at the Chesterfield Lane home during the time frame

described in his indictment. Nevertheless, the evidence of the trustee's deed did not preclude the offense occurring before A.S. turned 17 years old. Rather, there were several months—August, September, and most of October (A.S.'s birthday was October 22)—when A.S. was still under 17 years old and defendant was living at the Chesterfield Lane home. See 720 ILCS 5/12-16(d) (West 1998) (the victim must be at least 13 years of age but under 17 years of age).

¶ 99    The trial court specifically found A.S.'s testimony credible as to the events to which she testified. She testified to attending a *summer* cookout at defendant's Chesterfield Lane home, which was consistent with her testimony that the offense happened prior to her birthday on October 22. She also described where the abuse occurred at the side of defendant's home, testifying to an electrical or water meter box at the side of the house, and she identified pictures of the side of the house that were consistent with her testimony. A.S. did not tell anyone about defendant's conduct for several years, telling her mother around 2000 or 2002 when she was attending Northern Illinois University after having attended community college, which supported that the conduct occurred while she was still in high school in the late 1990s.

¶ 100   Terrance likewise described defendant's house, including defendant's Cat 5 wiring, which defendant confirmed was present at the house. Terrance also described the side of the house and identified pictures of the house. When defendant was asked in his direct testimony whether he lived at the house depicted in the State's pictures of the Chesterfield Lane home, he answered yes.

¶ 101   Considering A.S.'s and Terrance's testimony in the light most favorable to the State, we conclude that it was reasonable for the trial court to find that A.S. was indeed present at defendant's Chesterfield Lane home for a cookout during the summertime. In finding A.S.'s account credible, the trial court implicitly rejected defendant's trial testimony that he was "reasonably certain" A.S. was never at his Chesterfield Lane home. Even though the trustee's deed might have precluded a

finding that A.S. was present at the Chesterfield Lane home in the summer of 1998, a rational trier of fact could have found that A.S. was present at the Chesterfield Lane home in the summer of 1999, which would still be before she turned 17 on October 22, 1999. In other words, it was not so unreasonable or improbable for the trial court, sitting as the trier of fact, to have simultaneously believed A.S. that the abuse occurred at defendant's Chesterfield Lane home and that she misremembered by one year in which late-1990s summer the abuse occurred.

¶ 102   Regarding section 111-3(a)(4) of the Code's requirement that a criminal charge state the date of the offense, Illinois courts have previously explained that the date of the offense is not an essential factor in child sex offense cases and that the State need provide the defendant with only the best information it has of when the offenses occurred. *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005); see also *People v. Albarran*, 2018 IL App (1st) 151508, ¶ 22 (explaining that, in cases involving the sexual abuse of a child, the State is permitted flexibility in section 111-3(a)(4)'s date requirement). As such, the State did not misstate the law before the trial court, and defendant's indictment describing the offense as occurring between June 1 and September 1, 1998, which was based on the information it had from A.S., did not preclude the trial court from finding that aggravated criminal sexual abuse occurred between August 1 and October 22, 1999.

¶ 103                    C. Ineffective Assistance of Counsel

¶ 104   Defendant next argues that his trial counsel provided ineffective assistance when his counsel failed to object to portions of Maria's and Margaret's testimony as hearsay and to object to A.S.'s testimony regarding her posttraumatic stress disorder (PTSD). The specific hearsay statements that defendant challenges were Maria's testimony that A.S. told her that defendant had molested her repeatedly over a period of time and Margaret's testimony that A.S. told her to never be alone with defendant. Defendant argues that his trial counsel's failure to object to the hearsay

testimony was not the product of sound trial strategy and that the hearsay statements prejudiced him because they corroborated A.S.'s testimony and bolstered her credibility. Last, as to A.S.'s testimony that she suffered a PTSD attack during training to be an educator, defendant argues that the testimony was irrelevant and that it impermissibly evoked sympathy for A.S.

¶ 105    The State responds that Maria's testimony was offered for the permissible, nonhearsay purpose of effect on the listener. That is, A.S.'s statement to Maria was offered in the context of explaining why Maria contacted DCFS and not the police after A.S.'s disclosure to her. Regarding Margaret's testimony, the State argues that it permissibly asked her on redirect examination, in response to defendant's cross-examination of Margaret, about what A.S. told her concerning defendant. It argues that it questioned Margaret to establish her age when A.S. made the statement about defendant. Finally, the State argues that A.S.'s testimony about suffering a PTSD attack during her educator's training was not hearsay. We do not understand why the State makes this argument when defendant never contends that the PTSD testimony *was* hearsay.

¶ 106    To show ineffective assistance, defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Dupree*, 2018 IL 122307, ¶ 44. The two prongs that defendant must show are that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) he was prejudiced by his counsel's deficient performance. *Id.* To establish deficient performance, defendant must show that his trial counsel was not functioning as the counsel guaranteed by the sixth amendment and must overcome the strong presumption that counsel's performance was the product of sound trial strategy. *Id.* To establish prejudice, he must show that, but for his trial counsel's deficient performance, there was a reasonable probability that the result of the proceeding would have been different—that is, his counsel's deficient performance was so serious that it deprived him of a fair trial. *Id.*

¶ 107   We first address A.S.'s statement that, while undergoing mandatory training to become an educator in California, she had a "pretty intense PTSD attack and started to question a lot of things" involving her past with defendant. We disagree that defense counsel was ineffective for not objecting to this part of A.S.'s testimony.

¶ 108   The general rule in a bench trial is that we presume the trial court considered only admissible evidence. *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 138. That presumption is negated where the trial court admits evidence over a defendant's objection. *Id.*; see *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 261 (we presume that the trial court considered only properly admitted evidence unless the record affirmatively rebuts that presumption). Here, however, defendant did not object to A.S.'s testimony. Even if counsel had objected, the improper admission of evidence is harmless where there is no reasonable probability that the evidence's admission prejudiced the defendant. *McCullough*, 2015 IL App (2d) 121364, ¶ 138.

¶ 109   Here, A.S. testified only briefly to having PTSD symptoms, in the context of explaining how she eventually decided to report defendant's abuse. Although a lay witness should not be testifying to an undiagnosed psychiatric disorder, the primary purpose of A.S.'s testimony was to explain how she came to report defendant's abuse, not to simply elicit the factfinder's sympathy. Also, unlike the case law that defendant cites in support, A.S. did not testify to receiving *treatment* for PTSD. See, *e.g.*, *People v. Hodor*, 341 Ill. App. 3d 853, 860 (2003) ("Generally, testimony regarding psychiatric treatment is inadmissible."). A.S. testified only that she had gone to therapy when she was an educator, but she did not say that it was for any particular condition. The purpose of the therapy testimony was to provide further context showing the process she went through to reach the point of reporting defendant's conduct. In sum, A.S.'s casual implication that she had PTSD was not prejudicial error: her limited testimony had a purpose other than evoking sympathy,

and this was a bench trial where the record does not rebut the presumption that the trial court considered only admissible evidence.

¶ 110    Turning to Margaret's testimony, elicited by the State on redirect examination, that A.S. told her to never be alone with defendant, we again hold that counsel was not ineffective by failing to object. Even assuming that Margaret's statement was inadmissible hearsay, defense counsel had already elicited the same statement on cross-examination. To wit, defense counsel questioned Margaret as follows:

"Q. When did [A.S.] first tell you that she may have been molested by [defendant]?

A. She indicated at some point in my youth to never be alone with [defendant].

Q: Was it around 2013 or 2014 that [A.S.] first confided in you what happened between her and [defendant]?

A: I don't recall."

Given that defense counsel invited Margaret's testimony on cross-examination, the State's elicitation of the same testimony on redirect examination was cumulative evidence and did not prejudice defendant. See *People v. Plair*, 51 Ill. App. 3d 75, 80 (1977) ("Admission of hearsay evidence is not prejudicial where that evidence is merely cumulative and where the accused's guilt is sufficiently established by proper evidence.").

¶ 111    Defendant argues that, even if we find that his trial counsel opened the door to Margaret's testimony, his counsel's performance was deficient for eliciting her testimony and failing to move to strike it as unresponsive and hearsay. We disagree. It was a matter of trial strategy to ask about A.S.'s disclosure to Margaret, and although counsel did not move to strike her response, counsel immediately followed up by suggesting that the earliest A.S. confided in her was 2013. Furthermore, we must presume that the trial court ignored any improperly admitted statement, and,

even if the trial court considered the statement, there was no reasonable probability that defense counsel's elicitation of this single, isolated statement led the trial court to find A.S. credible where it otherwise would not have.

¶ 112   Last, we hold that defense counsel was not ineffective in failing to make a hearsay objection to Maria's testimony that A.S. told her that defendant molested her. Even if we assume the statement was hearsay, we again presume that the trial court ignored any improperly admitted evidence. In addition, the statement did not prejudice defendant. The trial court found A.S. credible as to the events to which she testified, and her testimony was corroborated not simply by Maria's complained-of testimony but also by Terrance's observation of A.S. with an aroused defendant at the side of the house where A.S. alleged the charged abuse occurred. Furthermore, we have already determined that the record included properly admitted other-crimes evidence of defendant's propensity to sexually abuse A.S., which corroborated her testimony. As such, there was no reasonable probability that Maria's testimony of A.S.'s statement affected the outcome of defendant's bench trial.

¶ 113                     D. Rebuttal Testimony

¶ 114   Last, defendant argues that the trial court erred in allowing A.S. to testify in rebuttal about a conversation she heard between defendant and his wife, Christine. The conversation pertained to who would drive A.S. home, and, at the conclusion of the conversation, defendant drove her home. Defendant argues that he did not present any evidence relating to the conversation during his case-in-chief and, as such, A.S.'s rebuttal testimony was an inappropriate "second bite at the apple" because it did not explain, contradict, or in any other way respond to his evidence.

¶ 115   We reject defendant's argument. Whether to allow rebuttal testimony is within the trial court's sound discretion. *People v. Robles*, 314 Ill. App. 3d 931, 937 (2000). We will not disturb

a trial court's ruling allowing rebuttal testimony unless there has been a clear abuse of discretion resulting in a manifest injustice to the defendant. *Id.* An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable. *People v. Nelson*, 2019 IL App (2d) 161097, ¶ 11.

¶ 116 Rebuttal evidence is evidence that tends to explain, repel, contradict, or disprove the evidence presented by the defendant. *People v. Williams*, 209 Ill. App. 3d 709, 723 (1991). Rebuttal testimony cannot relate solely to a collateral issue; that is, the evidence must have relevance to some matter of consequence to the action as defined by the pleadings. *People v. Eveans*, 277 Ill. App. 3d 36, 48 (1996). The mere fact that rebuttal evidence could have been introduced by the State in its case-in-chief does not render the evidence inadmissible in rebuttal. *Robles*, 314 Ill. App. 3d at 938. Rebuttal witnesses may repeat portions of the matters they testified to during the State's case-in-chief, so long as the trial court determines that the evidence helps to explain, repel, or contradict the defendant's case. *People v. Williams*, 223 Ill. App. 3d 692, 699 (1992). Even if the admission of rebuttal evidence constitutes an abuse of discretion, we will not reverse absent a showing that the defendant was thereby prejudiced. *Williams*, 209 Ill. App. 3d at 723; *People v. Ross*, 100 Ill. App. 3d 1093, 1096 (1981).

¶ 117 Here, A.S.'s rebuttal testimony of the conversation between defendant and Christine served to directly contradict two points of Christine's testimony from her cross-examination: (1) Christine's testimony that defendant never made an "off-color joke about rock stars" and, more importantly, (2) her testimony that, had A.S. been at defendant's home to babysit, Christine would have driven A.S. home because she always drove the female babysitters home. Since Christine had opened herself up to rebuttal testimony on these matters, the trial court did not abuse its discretion in allowing A.S. to testify that defendant made a joke in front of Christine about rock stars and

sex, that defendant and Christine had a long debate about who would drive A.S. home, and that ultimately it was defendant who drove her home. Accordingly, the trial court did not abuse its discretion in permitting A.S.'s rebuttal testimony.

¶ 118                                    III. CONCLUSION

¶ 119   For the foregoing reasons, we affirm the judgment of the circuit court of Kendall County.

¶ 120   Affirmed.

¶ 121   JUSTICE HUTCHINSON, dissenting:

¶ 122   I respectfully dissent from the majority's affirmance of the trial court's judgment. I believe that the trial court failed to conduct a meaningful assessment of the probative value versus the prejudicial impact of the other crimes-evidence, *i.e.*, the pool evidence involving A.S. and the plea evidence involving E.O. Accordingly, I would hold that the admission of this other-crimes evidence was not harmless error.

¶ 123   Harmless error analysis applies when the defendant has properly preserved a trial error for review; plain error analysis applies when the defendant has failed to preserve a trial error for review. The difference between a harmless error analysis and a first-prong plain error analysis is the allocation of the burden of persuasion. Under the first prong of the plain error rule, the defendant bears the burden of persuasion with respect to showing prejudice due to the error. Under harmless error analysis, the State has the burden of persuasion to show a lack of prejudice despite the error. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). When error is shown to exist, a reversal is mandatory, unless it is clearly shown that the error was not prejudicial. *People v. Lawler*, 142 Ill. 2d 548, 562 (1991).

¶ 124   The majority concedes that the trial court failed to conduct a meaningful assessment of the evidence for the purpose of showing defendant's criminal propensity pursuant to section 115-3.7.

However, the majority finds no abuse of discretion in allowing the swimming pool evidence, because the trial court could have reasonably found that the probative value of the swimming pool evidence was not substantially outweighed by its prejudicial effect. The record indicates that the exact opposite finding is reasonable, further compounding the trial court's error in failing to conduct the requisite meaningful assessment.

¶ 125    The testimony presented at trial showed that the pool incident and the charged conduct were not proximate in time. The State proffered that, when A.S. was 14 years old, defendant touched and fondled her breasts and vagina while swimming in her family pool "in the months leading up to the [charged conduct]." The State's evidence showed that the pool incident occurred at least a year prior to the charged conduct, which took place "between June 1, 1998, and September 1998," the summer months when A.S. was 15 years old. As such, the pool acts alleged occurred not "in the months" preceding the charged conduct but a year prior, when A.S. was approximately 14 years old. These acts were not a "continuing narrative" of a single course of action that lasted a year or two. The testimony presented showed that the events in which defendant allegedly swam with A.S. were "sporadic, not frequent, or even common."

¶ 126    Further, the alleged swimming pool incident shares little factual similarity to the charged conduct. The pool acts allegedly "involved fondling disguised as normal roughhousing, occurring out in the open at A.S.'s family pool at an event hosted by her family," while the charged conduct involved defendant separating A.S. from a jungle gym *** before he touched her chest and vagina" at the side of his house.  A.S.'s testimony that defendant attempted to pull her hands towards his erection was not consistent with her description of the pool incident, in which there was no testimony that defendant had an erection or pulled A.S. towards him. Indeed, the only common similarity was A.S. herself.

¶ 127    The majority's holding on the admissibility of the pool incident as other-crimes evidence under section 115-7.3 seems to substitute this court for the State in overcoming the burden of persuasion to show a lack of prejudice despite the trial court's error in failing to make a reasonable assessment of that very evidence. Given the inherently prejudicial nature of other-crimes evidence (see *Lamonica*, 2021 IL App (2d) 200136, ¶ 51) and the evidence in the record showing the reasonable inadmissibility of that evidence, I do not believe that this court can affirm the trial court's allowance of the pool evidence. The trial court's failure to provide anything approaching the requisite meaningful assessment of that evidence as required by section 115-7.3 of the Code and our supreme court jurisprudence was an abuse of discretion. See *Donoho*, 204 Ill. 2d at 186.

¶ 128    The majority further concedes that the plea evidence involving E.O. should not have been admitted under section 115.73, but it holds the error to be harmless because "we cannot say that the erroneous introduction of one bad act involving E.O. was a material factor in his conviction." However, that holding is predicated on the assumption that A.S.'s testimony regarding defendant's alleged swimming pool misconduct was properly admitted, an assumption I have disputed above. Based on the facts of this case, the erroneous admission of the plea evidence, when coupled with the erroneously admitted pool evidence, clearly requires reversal.

¶ 129    Defendant flatly denied the charges in the indictment that he committed the offense of aggravated criminal sexual abuse between the June 1 and September 1, 1998. Indeed, unrefuted evidence introduced by defendant proved that the home wherein these offenses were alleged to have occurred did not even exist until August 1, 1999. This fact, when coupled with A.S.'s testimony regarding the charged conduct, reduces the evidence to "he said, she said," and closely balanced. Both sets of testimony are plausible, yet both cannot be true. Defendant's wife and son (not to mention a trustee's deed) confirmed the house did not exist during the time of the charged

conduct. Only A.S.'s father gave supporting testimony regarding the charged conduct by stating that he saw A.S., on the right side of the house by the air conditioning unit, with defendant, whom he observed to have a "full erection." A.S.'s father did not know what had taken place on the side of defendant's house before he came out. This testimony does not tip the closely balanced nature of the evidence in the State's favor. The fact that this testimony ends with A.S.'s father's observation of his underage daughter alone with a fully aroused man who remained unharmed and even unconfronted does little for its credibility in the eyes of even the most disinterested parent, let alone a reasonable person. The fact that the observation occurred on the side of a house that did not exist at the time only further calls its credibility into question.

¶ 130   "Where guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene." (Internal quotation marks omitted.) *Lawler*, 142 Ill. 2d at 561-62. The erroneous admission of other-crimes evidence carries a high risk of prejudice and calls for reversal. *People v. Woltz*, 228 Ill. App. 3d 670, 676 (1992). Therefore, I cannot agree that the improper admissions of the pool evidence and the plea evidence were harmless error. Defendant's conviction should be reversed and the cause remanded for a new trial, during which the trial court can make a meaningful assessment as to what the other-crimes evidence is being allowed to show, as required by statute and Illinois Supreme Court jurisprudence.

***People v. Adams*, 2023 IL App (2d) 220061**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 18-CF-391; the Hon. Robert P. Pilmer, Judge, presiding. |
| **Attorneys for Appellant:** | Gal Pissetzky, of Pissetzky Law, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eric C. Weis, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and Adam J. Rodriguez, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |